Patricia BADER, M.D., and Northeast Indiana Genetic Counseling, Inc., Appellants–Defendants,

v.

Ronald JOHNSON and Connie Johnson, Appellees–Plaintiffs.

No. 02S05–9709–CV–493.

Supreme Court of Indiana.

July 25, 2000.

John M. Clifton, Cathleen M. Shrader, Barrett & McNagny, Fort Wayne, Indiana, Karl Mulvaney, Bingham Summers Welsh & Spilman, Indianapolis, Indiana, Attorneys for Appellants.

Jack E. Morris, Benson, Pantello, Morris, James & Logan, Fort Wayne, Indiana, Attorney for Appellees.

**ON PETITION TO TRANSFER**

RUCKER, Justice

### Case Summary

Seeking damages for injuries they suffered when their child was born with severe birth defects, Ronald and Connie Johnson filed a complaint for medical malpractice against Dr. Patricia Bader and Northwest Indiana Genetic Counseling, Inc. (referred to collectively as Healthcare Providers). Healthcare Providers responded with a motion for summary judgment arguing that Indiana does not recognize the tort of "wrongful birth." The trial court denied the motion and Healthcare Providers appealed. Concluding that the Johnsons could pursue a wrongful birth cause of action, the Court of Appeals affirmed the trial court's denial of summary judgment. In its plurality opinion the Court of Appeals also determined that the Johnsons were not entitled to damages for

emotional distress. *Bader v. Johnson*, 675 N.E.2d 1119 (Ind.Ct.App.1997). We grant Healthcare Providers' petition for transfer and hold that the Johnsons have stated a cognizable claim for medical malpractice that can be analyzed using traditional principles of tort liability.

### Facts and Procedural History

The facts most favorable to the Johnsons as nonmoving parties show they gave birth to their first child in 1979. Born with hydrocephalus [1] and severe mental and motor retardation, the child required extensive medical care until her death at four months of age. When Connie became pregnant again in 1982, the Johnsons were fearful of bearing another child with congenital defects so they sought consultation with Dr. Bader. Testing showed the pregnancy was normal. Apparently the birth proceeded without complication. The Johnsons again sought counseling with Dr. Bader when Connie became pregnant in 1991. An amniocentesis performed at 19½ weeks gestation revealed no abnormalities. However, Dr. Bader performed an ultrasound test the same day that revealed a fetus with a larger than expected cavity within the brain and an unusual head shape. Dr. Bader requested her staff to schedule Connie for follow-up testing. Due to an office error however Connie was not scheduled and the ultrasound report was not forwarded to Connie's treating physician.

At 33 weeks gestation Connie's treating physician performed his own ultrasound test and discovered that the unborn child had hydrocephalus. It was too late to terminate the pregnancy and Connie gave birth on September 4, 1991. In addition to hydrocephalus, the child had multiple birth defects and died as a result four months later.

The Johnsons filed against Healthcare Providers a proposed complaint with the Indiana Department of Insurance. The complaint alleged negligence in Healthcare Providers' failure to inform the Johnsons of the result of the ultrasound test conducted at 19½ weeks gestation. In due course a medical review panel rendered an opinion concluding that Healthcare Providers failed to meet the applicable standard of care. Thereafter, the Johnsons filed a complaint in the Allen Circuit Court alleging that Healthcare Providers' failure to inform deprived the Johnsons of the opportunity to terminate the pregnancy. As a result the Johnsons sought a variety of damages.

Healthcare Providers responded with a motion for summary judgment contending Indiana does not recognize a claim for wrongful birth, and even if it does recognize such a claim, the trial court needed to determine what if any damages were recoverable. The trial court denied the summary judgment motion and concluded the Johnsons could recover damages for the following: (1) the extraordinary costs necessary to treat the birth defect, (2) any additional medical or educational costs attributable to the birth defect during the child's minority, (3) medical and hospital expenses incurred as a result of the physician's negligence, (4) the physical pain suffered by the mother, (5) loss of consortium, and (6) the mental and emotional anguish suffered by the parents. Healthcare Providers appealed the decision. Except for emotional distress damages, the Court of Appeals affirmed the judgment of the trial court. We grant transfer.

1. Hydrocephalus is defined as:

A condition, occurring usually in infants, marked by an abnormal increase in the fluid (cerebrospinal fluid) which is normally present in small amounts in and around the brain. As a result, the small cavities within the brain become distended, i.e., the ventricles become enlarged. The pressure of the fluid between the brain and the cranium and within the ventricles of the brain causes the brain tissue to shrivel up and the skull to become enlarged, especially in the region of the forehead.

2 J. E. SCHMIDT, M.D., ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER H–132 (Matthew Bender 1990).

## Discussion

### I.  Standard of Review

■■■  On appeal from the denial of a motion for summary judgment, we apply the same standard applicable to the trial court.  *Doe v. Shults–Lewis Child and Family Services, Inc.*, 718 N.E.2d 738, 745 (Ind.1999).  We must determine whether the record reveals a genuine issue of material fact and whether the trial court correctly applied the law.  *Shuamber v. Henderson*, 579 N.E.2d 452, 454 (Ind. 1991).  Any doubt as to a fact or an inference to be drawn, is resolved in favor of the non-moving party.  *Malachowski v. Bank One, Indianapolis*, 590 N.E.2d 559, 562 (Ind.1992).  In addition, where the issue presented on appeal is a pure question of law, we review the matter *de novo*.  *State v. Moss–Dwyer*, 686 N.E.2d 109, 110 (Ind.1997).  "Appellate courts independently, and without the slightest deference to trial court determinations, evaluate those issues they deem to be questions of law.  A pure question of law is one that requires neither reference to extrinsic evidence, the drawing of inferences therefrom, nor the consideration of credibility questions for its resolution."  4A KENNETH M. STROUD, INDIANA PRACTICE § 12.3 at 134 (2d ed.1990).

### II.  Cause of Action

■■■  Although not disputing the operative facts in this case, Healthcare Pro-

viders contend the trial court erred in denying its motion for summary judgment because as a matter of law Indiana does not recognize a claim in tort for wrongful birth.  Although a popular characterization among some commentators and a number of jurisdictions[2] the term "wrongful birth"[3] seems to have its genesis as a play upon the statutory tort of "wrongful death."  *See* Alexander M. Capron, *Tort Liability in Genetic Counseling*, 79 COLUM. L.REV. 618, 634 n. 62 (1979).  However, as the Nevada Supreme Court observed, "we see no reason for compounding or complicating our medical malpractice jurisprudence by according this particular form of professional negligence action some special status apart from presently recognized medical malpractice or by giving it the new name of 'wrongful birth.'"  *Greco v. United States*, 111 Nev. 405, 893 P.2d 345, 348 (1995).  We agree.  It is unnecessary to characterize the cause of action here as "wrongful birth" because the facts alleged in the Johnsons' complaint either state a claim for medical malpractice or they do not.  Labeling the Johnsons' cause of action as "wrongful birth" adds nothing to the analysis, inspires confusion, and implies the court has adopted a new tort.

■■■  Medical malpractice cases are no different from other kinds of negligence actions regarding that which must

---

**2.**  *See, e.g., Keel v. Banach*, 624 So.2d 1022 (Ala.1993); *Arche v. U.S. Dept. of the Army*, 247 Kan. 276, 798 P.2d 477 (1990); *Blake v. Cruz*, 108 Idaho 253, 698 P.2d 315 (1984); Mark Strasser, *Wrongful Life, Wrongful Birth, Wrongful Death, and the Right to Refuse Treatment: Can Reasonable Jurisdictions Recognize All But One?*, 64 Mo. L.REV. 29 (1999); Elizabeth F. Collins, *An Overview and Analysis: Prenatal Torts, Preconception Torts, Wrongful Life, Wrongful Death, and Wrongful Birth: Time for a New Framework*, 22 J. Fam. L. 677 (1984); Trotzig, *The Defective Child and the Actions for Wrongful Life and Wrongful Birth*, 14 FAM. L.Q. 15 (1980).

**3.**  "Wrongful birth" claims are generally described as causes of action brought by the parents of a child born with birth defects

alleging that due to negligent medical advice or testing they were precluded from making an informed decision about whether to conceive a potentially handicapped child or, in the event of a pregnancy, to terminate it. *Cowe v. Forum Group, Inc.*, 575 N.E.2d 630, 633 (Ind.1991). A cause of action based upon the same type of negligent conduct that seeks damages on behalf of the child rather than the parents is often referred to as "wrongful life." *Id.* The phrases "wrongful conception" or "wrongful pregnancy" refer to claims for damages brought by the parents of an unexpected child alleging that the conception of the child resulted from negligent sterilization procedures or a defective contraceptive product. *Id.*

be proven. The plaintiff must show: (1) duty owed to plaintiff by defendant, (2) breach of duty by allowing conduct to fall below the applicable standard of care, and (3) compensable injury proximately caused by defendant's breach of duty. *Oelling v. Rao*, 593 N.E.2d 189, 190 (Ind.1992). This jurisdiction has long recognized a physician's duty to disclose to her patient material facts relevant to the patient's decision about treatment. *Boruff v. Jesseph*, 576 N.E.2d 1297, 1299 (Ind.Ct.App.1991). Although a discussion of this duty has generally arisen in cases involving informed consent[4] and the doctrine of fraudulent concealment,[5] neither of which is alleged here, the underlying premise is still the same. In order for a patient to make an informed decision about her health, she must have the relevant facts at her disposal. If the physician has possession of those facts, then the physician has a duty to disclose them. "Th[is] duty arises from the relationship between the doctor and patient, and is imposed as a matter of law as are most legal duties." *Culbertson v. Mernitz*, 602 N.E.2d 98, 101 (Ind.1992) (quoting *Joy v. Chau*, 177 Ind.App. 29, 39, 377 N.E.2d 670, 676–77 (1978)).

In this case, the Johnsons allege they consulted Healthcare Providers to obtain information having a direct bearing on Connie's health, namely: a decision to terminate the pregnancy. According to the Johnsons the ultrasound test conducted by Healthcare Providers, revealing pre-natal abnormalities, was precisely the kind of information the couple needed to make an informed decision. For purposes of this summary judgment action we accept the Johnsons' assertions as true. *National City Bank, Indiana v. Shortridge*, 689 N.E.2d 1248, 1250–51 (Ind.1997). As a matter of law Healthcare Providers owed a duty to the Johnsons to disclose the result of the test.

■ As for a breach of duty, expert medical testimony is usually required to determine whether a physician's conduct fell below the applicable standard of care. *Simms v. Schweikher*, 651 N.E.2d 348, 350 (Ind.Ct.App.1995). This is generally so because the technical and complicated nature of medical treatment makes it impossible for a trier of fact to apply the standard of care without the benefit of expert

---

**4.** *See, e.g., In the Matter of Lawrance*, 579 N.E.2d 32, 38 (Ind.1991) ("Indiana's common law doctrine of informed consent recognizes the right of the patient 'to intelligently reject or accept treatment.'") (citations omitted); *Bowman v. Beghin*, 713 N.E.2d 913, 916 (Ind. Ct.App.1999) ("[The] standard [of care] requires that a physician provide information to a patient about a contemplated procedure that will permit the patient to make a decision whether or not to have the contemplated procedure."); *Boruff*, 576 N.E.2d at 1299 ("[I]nformed consent actions are based upon a breach of the physician's duty to 'make reasonable disclosure of material facts relevant to the patient's decisions about treatment ....'") (citation omitted); *Joy v. Chau*, 177 Ind.App. 29, 39, 377 N.E.2d 670, 676–77 (1978) ("It is clear that Indiana must recognize the duty of a physician to make a reasonable disclosure of material facts relevant to the decision which the patient is requested to make.").

**5.** *See, e.g., Weinberg v. Bess*, 717 N.E.2d 584, 590 (Ind.1999) ("In the medical malpractice context, the doctrine of fraudulent concealment may operate to toll the statutory period until the termination of the physician-patient relationship, or until the patient did discover, or in the exercise of reasonable diligence should have discovered, the doctor's alleged malpractice."); *Martin v. Rinck*, 501 N.E.2d 1086, 1089 (Ind.Ct.App.1986) ("[A] physician is under a duty to disclose material information to his patient; and failure to do so results in fraudulent concealment."); *Spoljaric v. Pangan*, 466 N.E.2d 37, 40 (Ind.Ct.App.1984) ("The significance of the doctrine of fraudulent concealment is that it operates to estop a defendant from asserting a statute of limitations defense when that person, by deception or the violation of a duty, has concealed material facts from the plaintiff preventing discovery of a wrong."); *Guy v. Schuldt*, 236 Ind. 101, 111–12, 138 N.E.2d 891, 897 (1956) (Under the doctrine of fraudulent concealment, "[p]rinciples of equity always intervene ... to prevent a party from gaining an advantage by wrongfully concealing an injury from one who does not become aware of the injury until a time after the statute of limitations has run.").

opinion on the ultimate question of breach of duty. *Id.* Here, however, we doubt whether expert testimony is required to determine whether Healthcare providers breached its duty. *See Harris v. Raymond,* 715 N.E.2d 388, 394 (Ind.1999) (stating that "not all medical malpractice cases are so technical that they require expert testimony."), *reh'g. denied.* If Healthcare Providers did not provide the Johnsons with the result of the ultrasound, then Healthcare Providers breached its duty. It does not appear to us that expert testimony is required on this point. In any event, the medical review panel in this case rendered an opinion concluding that Healthcare Providers failed to meet the applicable standard care. In addition, the Johnsons alleged a breach of duty and thus far in this litigation Healthcare Providers have not challenged the allegation. We accept them as true for purposes of this action. *National City Bank, Indiana,* 689 N.E.2d at 1250–51.

Assuming duty and breach of duty, we next address the third element of a medical malpractice cause of action: compensable injury proximately caused by the breach. According to the Johnsons, as a result of Healthcare Providers' conduct they were not informed of the fetus' condition until it was too late to terminate the pregnancy, resulting in Connie carrying to term and giving birth to a severely deformed child.

▆▆▆▆▆ An indispensable element of a negligence claim is that the act complained of must be the proximate cause of the plaintiff's injuries. *Oelling,* 593 N.E.2d at 190; *Havert v. Caldwell,* 452 N.E.2d 154, 158 (Ind.1983). A negligent act is the proximate cause of an injury if the injury is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated. *Havert,* 452 N.E.2d at 158; *Bridges v. Kentucky Stone,* 425 N.E.2d 125, 127 (Ind. 1981).[6]

▆▆▆ On the question of causation, Healthcare Providers make two claims: (1) there is an insufficient nexus between the Johnsons' claimed injury and the alleged act of negligence, and (2) Healthcare Providers did not "cause" the Johnsons' injury. At a minimum, proximate cause requires that the injury would not have occurred but for the defendant's conduct. *Cowe,* 575 N.E.2d at 635; *Johnson v. Owens,* 639 N.E.2d 1016, 1023 (Ind.Ct.App. 1994). The "but for" test presupposes that absent the defendant's conduct, a plaintiff would have been spared suffering the claimed injury. *Cowe,* 575 N.E.2d at 635. The Johnsons' claimed injury is that but for Healthcare Providers' failure to provide them with the result of the ultrasound test, the pregnancy would have been terminated. Whether the Johnsons can carry their burden of proof on this point at trial remains to be seen. However, at this stage of the proceedings the question is whether the Johnsons' carrying to term and giving birth to a severely deformed child can be the natural and probable consequence of Healthcare Providers' breach

---

**6.** It has been held that expert opinion is usually required to establish a causal connection between the acts or omissions of the physician and the injury to the patient. *Bowman,* 713 N.E.2d at 917; *Daub v. Daub,* 629 N.E.2d 873, 878 (Ind.Ct.App.1994); *see also Cahoon v. Cummings,* 715 N.E.2d 1, 17 (Ind.Ct.App. 1999) (declaring "it is well settled that in a medical negligence claim, the plaintiff must prove by expert testimony not only that the defendant was negligent, but also that the defendant's negligence proximately caused the plaintiff's injury."), *reh'g. denied,* (quoting *Schaffer v. Roberts,* 650 N.E.2d 341, 342 (Ind. Ct.App.1995)). This court has never ad-

dressed the precise issue of whether a "causation" expert is required in a medical negligence case. And we decline to do so here because the issue is not before us. However, we do observe that the injury to the Johnsons is the lost ability to terminate Connie's pregnancy, resulting in Connie carrying and giving birth to a deformed child. A lay jury is capable of deciding the truth of the Johnsons' claim that Connie would have terminated the pregnancy but for Healthcare Provider's failure to provide the result of the ultrasound. Thus, expert testimony on this point is unnecessary.

of duty, which Healthcare Providers should have foreseen or anticipated. This question must be answered affirmatively. Again, for purposes of this summary judgment action only, we accept as true the allegations contained in the Johnsons' complaint and the reasonable inferences to be drawn therefrom. The record shows the Johnsons consulted Healthcare Providers in 1982 when Connie was pregnant with her second child and again in 1991 when she became pregnant with her third child. The consultations were inspired by experiences the Johnsons encountered with their first child who was born with severe defects. The facts most favorable to the Johnsons suggest that Healthcare Providers knew or reasonably should have known that depending on the results of the ultrasound test, the Johnsons would not carry the pregnancy to term. We conclude, therefore that the Johnsons have made a *prima facie* claim of legal causation.

Advancing several public policy arguments, Healthcare Providers contend that even assuming duty, breach, and proximate cause the Johnsons still should not be allowed to pursue their claim. Chief among its arguments is that the court is being called upon "to weigh life (however imperfect) against the non-existence of life as that directly impacts the parents of the child." Brief of Appellant at 20. Characterizing the Johnsons' injury as the birth of a child with congenital defects, Healthcare Providers argue "life, even life with severe defects, cannot be an injury in the legal sense." Brief of Appellant at 24 (quoting *Cowe*, 575 N.E.2d at 635).

We first observe that the injury claimed in this case is not the child's defects themselves. The Johnsons do not claim that the negligence of Healthcare Providers "caused" their child's defects. Instead, they contend that Healthcare Providers' negligence caused them to lose the ability to terminate the pregnancy and thereby avoid the costs associated with carrying and giving birth to a child with severe defects. In the context of this medical malpractice action, the distinction between causing the Johnsons to forego termination of the troubled pregnancy and causing a defective birth is significant. The former is a matter of causation while the latter goes to the question of damages, which we discuss in more detail in the next section of this opinion. This distinction was amplified in *Cowe* where we were confronted with a claim by a child born to a mentally retarded mother. While in the custody of a nursing home the mother was raped, resulting in the child's birth. The child sued the nursing home contending, among other things, that because of the nursing home's negligence in failing to protect the mother from rape, the child was wrongly born "into a world in which there was no natural parent capable of caring for and supporting him." 575 N.E.2d at 632. We rejected the child's claim on two interrelated grounds: (1) "a general conceptual unwillingness to recognize any cognizable damages for a child born with a genetic impairment as opposed to not being born at all", and (2) "the impossibility of calculating compensatory damages to restore a birth defective child to the position he would have occupied were it not for the defendant's negligence." *Id.* at 634. Both interrelated grounds go to the issue of damages. It was in that context we declared "life, even life with severe defects, cannot be an injury in the legal sense." *Id.* at 635.

Thus, in *Cowe*, the injury was life itself. And as with numerous other jurisdictions we were unwilling to allow a child plaintiff to proceed with this cause of action, in part because it involved "a calculation of damages dependant upon the relevant benefits of an impaired life as opposed to no life at all ... a comparison the law is not equipped to make." *Id.* at 634 (internal citations omitted). Here, however, the injury is the lost opportunity and ability to terminate the pregnancy. Failure to allow the Johnsons to proceed with their claim would "immunize those in the medical field from liability for their performance in one

particular area of medical practice." *Garrison v. Foy*, 486 N.E.2d 5, 8 (Ind.Ct.App. 1985) (recognizing the existence of a cause of action for wrongful pregnancy). We decline to carve out an exception in this case, and see no reason to prohibit the Johnsons from pursuing their claim.

### III.  Damages

It is a well-established principle that damages are awarded to fairly and adequately compensate an injured party for her loss, and the proper measure of damages must be flexible enough to fit the circumstances. *Decatur County AG–Services, Inc. v. Young*, 426 N.E.2d 644, 646 (Ind.1981); *Terra–Products, Inc. v. Kraft General Foods, Inc.*, 653 N.E.2d 89, 93 (Ind.Ct.App.1995); *Wiese–GMC, Inc. v. Wells*, 626 N.E.2d 595, 597 (Ind.Ct.App. 1993). In tort actions generally, all damages directly related to the wrong and arising without an intervening agency are recoverable. *Erie Insurance Co. v. Hickman by Smith*, 622 N.E.2d 515, 519 (Ind. 1993). In negligence actions specifically, the injured party is entitled to damages proximately caused by the tortfeasor's breach of duty. *Peak v. Campbell*, 578 N.E.2d 360, 361 (Ind.1991). In order for a negligent act to be a proximate cause of injury, the injury need only be a natural and probable result thereof; and the consequence be one which in light of the circumstances should reasonably have been foreseen or anticipated. *Garrison*, 486 N.E.2d at 10.

Viewing this case as asserting a tort of "wrongful birth" the trial court determined that the Johnsons could recover the following damages: (1) the extraordinary costs necessary to treat the birth defect, (2) any additional medical or educational costs attributable to the birth defect during the child's minority, (3) medical and hospital expenses incurred as a result of the physician's negligence, (4) the physical pain suffered by the mother, (5) loss of consortium, and (6) the mental and emotional anguish suffered by the parents. The Court of Appeals also viewed this case as one for "wrongful birth." Thus, following the lead from other jurisdictions, with the exception of mental and emotional distress, the Court of Appeals agreed the Johnsons were entitled to recover the foregoing damages. However, we have determined that this case should be treated no differently than any other medical malpractice case. Consequently, we need not evaluate the type of damages that may be allowed in a claimed "wrongful birth" action. Rather, we look at the damages the Johnsons contend they suffered and determine whether, if proven, they be can said to have been proximately caused by Healthcare Providers' breach of duty. *See Peak*, 578 N.E.2d at 361.

Consolidated and rephrased the Johnsons' complaint essentially sets forth the following damages: (1) hospital and related medical expenses associated with the pregnancy and delivery, (2) costs associated with providing the infant with care and treatment, (3) lost income, (4) emotional distress, and (5) loss of consortium.[7] Indiana subscribes to the general principle of tort law that all damages directly attributable to the wrong done are recoverable. *Burris v. Riester*, 506 N.E.2d 484, 485 (Ind.Ct.App.1987). As we have indicated, the Johnsons' claimed injury in this case is the lost opportunity and ability to terminate the pregnancy. In turn, the loss can be measured by the medical and other

---

7. More specifically the Johnsons claimed that due to Healthcare Providers' negligence, "Connie Johnson was thereby forced to proceed with the pregnancy and go through the labor and delivery process; and both Plaintiffs were forced to bear the emotional pain and anguish of awaiting the birth of a child that would definitely suffer multiple congenital defects with minimal, if any, chance for any long term survival; to provide care and treatment for said infant; to incur extensive medical and related expenses; to suffer lost personal income; and suffer other damages commensurate with watching that child struggle for life and to ultimately see that child die." R. at 10. Ronald Johnson also sought a separate claim for loss of consortium. *Id.*

costs directly attributable to Connie carrying the child to term. In addition to emotional distress damages, which we discuss below, the damages the Johnsons seek are consistent with those naturally flowing from Healthcare Providers' breach of duty.[8]

In *Shuamber v. Henderson,* 579 N.E.2d 452 (Ind.1991), a mother and daughter sought recovery for the emotional distress they suffered when their son/brother was killed. The death occurred when the car in which the three were traveling was struck by a drunk driver. Indiana's traditional "impact rule" precluded mother and daughter from obtaining relief. The rule required that damages for mental distress or emotional trauma could be recovered only where the distress was accompanied by and resulted from a physical injury caused by an impact to the person seeking recovery. Mother and daughter could not recover because their emotional trauma was not triggered by their own injuries, but rather by witnessing the injuries of their son/brother. Although not abolishing the rule, this court modified it as follows:

> When, as here, a plaintiff sustains a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person, ... such plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff.

*Shuamber,* 579 N.E.2d at 456.

The underlying rationale for Indiana's traditional impact rule was that "absent physical injury, mental anguish is speculative, subject to exaggeration, likely to lead to fictitious claims, and often so unforesee-able that there is no rational basis for awarding damages." *Cullison v. Medley,* 570 N.E.2d 27, 29 (Ind.1991). As modified, the rule still requires physical impact as distinguished from physical injury. However, the rationale for requiring some type of physical impact is still the same. Stated somewhat differently, as the United States Supreme Court observed "[b]ecause the etiology of emotional disturbance is usually not as readily apparent as that of a broken bone following an automobile accident, courts have been concerned ... that recognition of a cause of action for [emotional] injury when not related to any physical trauma may inundate judicial resources with a flood of relatively trivial claims, many of which may be imagined or falsified, and that liability may be imposed for highly remote consequences of a negligent act." *Consolidated Rail Corporation v. Gottshall,* 512 U.S. 532, 545, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994) (quoting *Maloney v. Conroy,* 208 Conn. 392, 545 A.2d 1059, 1061 (1988)).

Indiana's physical impact requirement embraces these concerns. Thus, when the courts have been satisfied that the facts of a particular case are such that the alleged mental anguish was not likely speculative, exaggerated, fictitious, or unforeseeable, then the claimant has been allowed to proceed with an emotional distress claim for damages even though the physical impact was slight, or the evidence of physical impact seemed to have been rather tenuous. *See, e.g., Alexander v. Scheid,* 726 N.E.2d 272, 283–84 (Ind.2000) (holding that patient suffering from the destruction of healthy lung tissue due to physician's failure to diagnose cancer was sufficient for negligent infliction of emotional distress); *Holloway v. Bob Evans Farms, Inc.,* 695 N.E.2d 991, 996 (Ind.Ct. App.1998) (concluding that restaurant patron's ingestion of a portion of vegetables

---

8. Our examination of the Johnsons' complaint does not reveal a request for physical pain and suffering. We note in passing however that such damages are typically sought and are recoverable in negligence actions. *See, e.g., Wine–Settergren v. Lamey,* 716 N.E.2d 381, 383 (Ind.1999); *Cahoon,* 715 N.E.2d at 10.

cooked with a worm was a direct physical impact under the modified impact rule); *Dollar Inn, Inc., v. Slone,* 695 N.E.2d 185, 189 (Ind.Ct.App.1998) (finding that hotel guest stabbing herself in the thumb with a hypodermic needle concealed in a roll of toilet paper was sufficient for claim of emotional distress associated with guest's fear of contracting AIDS), *trans. denied.* Further, this court has determined that the modified impact rule does not require that the impact be initiated by the tortfeasor. *Conder v. Wood,* 716 N.E.2d 432, 435 n. 3 (Ind.1999). Rather, the impact need only "arise[ ] from the plaintiff's direct involvement in the tortfeasor's negligent conduct." *Id.* (finding that a pedestrian suffered a direct impact by pounding on the panels of a truck that was running over her co-worker).

█ In this case we find that Connie's continued pregnancy and the physical transformation her body underwent as a result, satisfy the direct impact requirement of our modified impact rule. Provided she can prevail on her negligence claim, we see no reason why Connie should not be able to claim damages for emotional distress. By contrast, Ronald did not suffer a direct impact as a result of Healthcare Provider's alleged negligence. We disagree with his argument to the contrary. Rather, at most Ronald is a relative bystander, a classification of potential victims this court has recently adopted in *Groves v. Taylor,* 729 N.E.2d 569, 572–73 (Ind.2000).[9] Whether Ronald can prevail on his claim for emotional distress damages depends on the evidence adduced at trial.

### Conclusion

We grant transfer, vacate the opinion of the Court of Appeals, affirm in part the trial court's denial of summary judgment, and remand to the trial court for further proceedings consistent with this opinion.

SHEPARD, C.J., and BOEHM, J., concur.

SULLIVAN, J., concurs in part and concurs in result with separate opinion.

DICKSON, J., dissents with separate opinion.

SULLIVAN, Justice, concurring in part and concurring in result.

I agree with the majority that the trial court properly denied defendants' motion for summary judgment on plaintiffs' claim seeking damages for injuries they allege they suffered when their child was born with profound, life-threatening disabilities. However, I disagree with its analysis in several respects. As to both liability and to damages other than damages for emotional distress, I would adopt the reasoning of the Court of Appeals in this case. *See Bader v. Johnson,* 675 N.E.2d 1119, 1122–1125, 1125 (Ind.Ct.App.1997). As to damages for emotional distress, I concur in the majority's analysis.

DICKSON, Justice, dissenting.

The plaintiff-parents in this case seek damages claiming that the defendant health care providers' breach of medical duty prevented them from having the opportunity to decide whether to terminate a pregnancy because of pre-natal abnormalities. I believe this Court should not expand the common law to permit parents to seek damages in such a case. In *Cowe v. Forum Group, Inc.,* 575 N.E.2d 630 (Ind. 1991), we explained that "wrongful life" and "wrongful birth" actions are distinguished solely by whether the actions seek damages on behalf of the child or the parent:

> with a relationship to the plaintiff analogous to a spouse, parent, child, grandparent, grandchild, or sibling caused by the defendant's negligent or otherwise tortuous conduct." *Groves,* 729 N.E.2d at 573.

---

9. "[W]here the direct impact test is not met, a bystander may nevertheless establish 'direct involvement' by proving that the plaintiff actually witnessed or came on the scene soon after the death or severe injury of a loved one

The phrase "wrongful birth" applies to claims brought by the parents of a child born with birth defects alleging that due to negligent medical advice or testing they were precluded from an informed decision about whether to conceive a potentially handicapped child or, in the event of a pregnancy, to terminate it. When such action seeks damages on behalf of the child rather than the parents, the phrase "wrongful life" instead of "wrongful birth" is employed.

*Id.* at 633 (citations omitted). Actions for "wrongful life" and "wrongful birth" are different from other kinds of negligence actions. In *Cowe*, we held that "[d]amages for wrongful life are not cognizable under Indiana law," *id.* at 635, for two principal reasons: (1) "[a] general conceptual unwillingness to recognize any cognizable damages for a child born with a genetic impairment as opposed to not being born at all," and (2) the impossibility of calculating compensatory damages to restore a child born with a birth defect to the position he would have occupied were it not for the defendant's negligence, *id.* at 634. But it was primarily the former concern upon which we focused, concluding that " 'life, even life with severe defects, cannot be an injury in the legal sense.' " *Id.* at 635 (quoting *Azzolino v. Dingfelder*, 315 N.C. 103, 337 S.E.2d 528, 531 (1985)). Although this case presents a claim for wrongful birth, the same concerns permeate it as well.

The majority opinion, treating the claim as a routine negligence claim, establishes troubling precedent, particularly as to the nature and extent of damages. If such claimants may recover all damages naturally flowing from a medical provider's breach of duty, would this not also include the costs of raising and educating such "unwanted" children? Will the birth of a child with even slight congenital anomalies entitle the parents to claim medical malpractice damages, contending that "if they had only known" their child would have a birth defect, they would have terminated the pregnancy? Will our courts face actions by parents seeking child-rearing costs because the gender of their child was not as expected, when they had sought genetic counseling for the purpose of terminating the pregnancy in the event that the child was of the "wrong" gender? Will defendant health-care providers be entitled to claim a reduction in damages by presenting evidence and arguing that, if the plaintiff-parents had elected to terminate the pregnancy, they would likely have suffered substantial and continuing psychological trauma? Will the process of jury selection (and resulting appeals) become a new battleground for intense disagreements regarding the issue of abortion? These are but a few of the troubling, foreseeable consequences of the majority opinion.

I believe that, because of the resulting complex philosophical, moral, and political implications, this Court should not expand Indiana common law to permit parents to seek damages resulting from the loss of an opportunity to terminate a pregnancy. As we noted in *Cowe*, this involves "a calculation of damages dependent upon the relative benefits of an impaired life as opposed to no life at all." *Cowe*, 575 N.E.2d at 634 (quoting *Siemieniec v. Lutheran Gen. Hosp.*, 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691, 697 (1987)). Courts are ill-equipped to provide fair, reasonable, and intelligent resolutions to these questions.

I therefore dissent and believe that summary judgment should be entered in favor of the defendants.