Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

ATTORNEYS FOR APPELLANT:

**WILLIAM W. DRUMMY**
**HOLLY A. REEDY**
Wilkinson, Goeller, Modesitt,
Wilkinson & Drummy, LLP
Terre Haute, Indiana

**DOUGLAS V. JESSEN**
Statham Allega & Jessen, LLP
Evansville, Indiana

ATTORNEY FOR APPELLEE:

**ROCCO A. MARRESE, M.D.**
Law Office of Rocco A. Marrese, M.D.
Evansville, Indiana



FILED
Dec 31 2012, 11:31 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| FRANCIS McDONNELL, M.D., | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 82A04-1202-CT-56 |
| | ) | |
| STACY WISSEL, AS TRUSTEE OF THE | ) | |
| BANKRUPTCY ESTATE OF ROY L. HARRIS | ) | |
| AND ANITA K. HARRIS, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Wayne S. Trockman, Judge
Cause No. 82D03-0801-CT-424

**December 31, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Roy L. Harris ("Roy") and Anita K. Harris ("Anita") (collectively "the Harrises") brought a claim for medical malpractice against Dr. Francis McDonnell ("Dr. McDonnell"), Dr. Peter Stevenson ("Dr. Stevenson"), and Deaconess Hospital ("Deaconess"). Stacy Wissel ("Wissel"),[1] the trustee of the bankruptcy estate of the Harrises, was subsequently substituted as the named plaintiff for purposes of pursuing the claims against the defendants. The Vanderburgh Superior Court found in favor of the Harrises with regard to their claim against Dr. McDonnell but in favor of Stevenson and Deaconess with regard to the claim against them. Dr. McDonnell appeals and presents six issues for our consideration, which we consolidate and restate as:

I.  Whether the trial court applied an incorrect legal standard and placed the burden of proof on Dr. McDonnell;

II. Whether the trial court's judgment is clearly erroneous in that it is unsupported by findings that Dr. McDonnell's failure to meet the applicable standard of care was the proximate cause of Anita's injuries;

III. Whether the trial court's judgment is clearly erroneous in that it is unsupported by findings to support the trial court's award of damages;

IV. Whether the trial court abused its discretion in awarding pre-judgment interest.

We affirm the trial court's determination of liability and damages, but reverse the award of prejudgment interest.

**Facts and Procedural History**

On August 4, 2000, Anita was working as a salesman for a life insurance company and was making a call at a customer's home when she was bitten by the homeowner's

---

[1] The Harrises filed for Chapter 11 Bankruptcy relief on May 14, 2003. And on May 25, 2010, by agreement of the parties, the complaint in this case was amended to show Wissel as the plaintiff. Thus, by the time of the judgment against Dr. McDonnell, Wissel was the plaintiff and is the current appellee.

2

dog. As a result, Anita suffered a serious wound on her left arm and later suffered from complications, including a severe infection. This later led to Anita developing reflex sympathetic dystrophy, causing her to have numerous maladies, including: difficulty with her short-term memory, sleeplessness, dizziness, blurred vision, neck pain, headaches, change of color on parts of her left hand and arm, and numbness and pain spreading to her entire right upper extremity. Because of her continuing pain, Anita was referred to the Cleveland Clinic. There, a physician recommended that Anita receive continuing treatment for her pain, including a "tunneled epidural catheter" that could infuse pain medication. Tr. p. 127.

Subsequently, Anita was referred to Dr. McDonnell, who worked at the Pain Clinic at the University of Kentucky Medical Center in Lexington, Kentucky. Dr. McDonnell placed an epidural catheter in Anita that remained in place for twelve weeks. This treatment resulted in significant relief for Anita for approximately one month, but her pain gradually returned. On August 18, 2001, Dr. McDonnell placed a cervical epidural catheter in Anita for continuous infusion of pain medication.

Six days later, Anita was exiting her car when the external end of the catheter was accidentally pulled from the infusion pump. Roy telephoned Dr. McDonnell, and McDonnell gave Roy instructions on how to reconnect the catheter to the pump. Roy did so, but the next day Anita went to a pain clinic at Deaconess Hospital in Evansville, Indiana, where a nurse disconnected, cleaned, trimmed, and reconnected the catheter tube to the infusion pump. Per Dr. McDonnell's instructions, the nurse also doubled the infusion rate.

The following morning, however, Anita began to have pain in her neck. Roy called the hospital and was told to take his wife to the emergency room. At the emergency room, Anita complained of pain in her back and upper neck; she described her pain to the nurse as feeling as if "her brain [was] going to explode," and further stated that it was different than the pain she was being treated for with the catheter and pump. Tr. p. 228. The nurse noted that the right side of Anita's neck was tender to touch. Anita was eventually seen by Dr. Stevenson. Dr. Stevenson noted that Anita had been prescribed an antibiotic by Dr. McDonnell, but she had been unable to fill the prescription because Dr. McDonnell was not licensed to practice in Indiana. Dr. Stevenson also noted that Anita complained of extreme pain in her face and neck, but concluded that she did not have meningitis because there was no stiffness in her neck.

Dr. Stevenson then consulted with Dr. McDonnell over the telephone, and Dr. McDonnell concluded that there was nothing wrong with the catheter and that Anita's neck pain was caused by irritation to her lesser occipital nerve and that her pain should be treated by continuing the use of the infusion pump in addition to over-the-counter non-steroidal anti-inflammatory medications ("NSAIDs"), muscle relaxers, and heat. Dr. Stevenson gave Anita a prescription for an antibiotic that could be filled, and discharged her at approximately 2:00 p.m. Anita was given Dr. McDonnell's telephone number and told to call him if she had any problems.

Later that evening, Anita began to run a fever of 101.5 degrees Fahrenheit, but Roy did not call Dr. McDonnell until approximately 2:00 a.m. the following morning, when Anita's fever had reached 102.6 degrees Fahrenheit. By this time, Anita had

4

become unresponsive, was unable to walk, and was moaning loudly. When Roy relayed this information to Dr. McDonnell, he was instructed to remove the catheter, give her a dose of antibiotics, and take her to the emergency room. Still, Roy did not take Anita to the emergency room immediately. Anita began to vomit at 4:00 a.m., and then became delirious and unresponsive to verbal commands. Later that morning, Roy called for an ambulance, and Anita arrived at the hospital at approximately 11:20 a.m.

At the hospital, the intake nurse listed Anita's main afflictions as fever, disorientation, and headache. An emergency room physician, Dr. Michael Peters ("Dr. Peters") saw Anita and listed her symptoms as confusion, fever, headache, and neck stiffness that began during the night. Dr. Peters and other physicians at the hospital noted these as symptoms of meningitis. A lumbar puncture returned cloudy spinal fluid, and Anita was admitted to the hospital with a diagnosis of bacterial meningitis. Anita testified that during this stay at the hospital, Dr. McDonnell came into her room and stated, "There's the girl I gave meningitis to." Tr. p. 794. After being treated with several antibiotics, Anita was finally discharged on August 26, 2001.[2] In the discharge summary, Dr. Mathias Kolleck II ("Dr. Kolleck") noted that Anita had been admitted to the emergency room with "classic meningeal signs." Exhibit Vol. III, p. 73.

As a result of her meningitis, Anita had to undergo speech therapy, and suffered from hearing loss. She also suffers from mental impairment, and was initially even unable to recognize her own children. She has problems with math skills and

---

[2] On August 29, 2001, Anita was readmitted to the hospital to be treated for gastroenteritis caused by an internal *clostridium difficile* infection, which resulted from her being treated with antibiotics.

remembering dates, and even has difficulty finding her way home while driving. A report prepared by a psychiatric social worker indicated that Anita is now seriously mentally impaired. Even though Anita had hoped to return to work, she had to apply for disability benefits.

On January 25, 2008, the Harrises filed their complaint alleging medical malpractice against Dr. McDonnell, Dr. Stevenson, and Deaconess. As neither party requested a jury trial, a bench trial was held on May 3 through May 14, 2010, at which time the trial was continued to September 8, 2010.[3] This date was later continued to January 18, 2011, and the trial was completed on January 27, 2011. After the parties submitted their proposed findings and conclusions, the trial court entered its findings of fact and conclusions of law on October 27, 2011. The trial court found in favor of Dr. Stevenson and Deaconess, but found that Dr. McDonnell had been negligent. The trial court determined that Anita's damages totaled $456,288.79 and that Roy's damages were $75,000, for a total of $531,288.79, plus pre-judgment interest in the amount of 8% from January 25, 2008, and court costs. Dr. McDonnell now appeals.

## I. Improper Burden of Proof

Dr. McDonnell first claims that the trial court improperly placed upon him the burden of disproving the plaintiffs' claims. Specifically, Dr. McDonnell takes issue with the following portion of the trial court's conclusions of law:

---

[3] On May 24, 2010, the defendants filed a motion to dismiss the complaint on grounds that it was not being prosecuted by the real party in interest, Wissel, the Trustee of the Bankruptcy Estate of the Harrises. As noted above, the complaint was subsequently amended to show Wissel as the plaintiff.

6

2. The defendant, Francis McDonnell, M.D., failed to comply with the applicable standard of care in his care and treatment of Anita Harris. Specifically, *Dr. McDonnell has failed to show* that he exercised the reasonable, careful, skillful, and prudent degree of skill as required by law in that Dr. McDonnell:

> (a) *has failed to show* that the applicable standard of care was met by not having Mr. Harris drive no more than an additional 15-20 minutes to the hospital to have the catheter initially either removed or reconnected by a medical professional . . . .

Appellant's App. pp. 10-11 (emphases added). Dr. McDonnell claims that this establishes that the trial court placed upon him the burden of disproving his negligence, when the burden of proof was properly on the plaintiffs.

To be sure, the burden of proving a claim of negligence rests with the plaintiff. It is well settled that, "[i]n a medical malpractice action based on ordinary negligence, *the plaintiff must establish* (1) a duty on the part of the defendant physician in relation to the plaintiff, (2) failure of the physician to meet the requisite standard of care, and (3) an injury to the plaintiff resulting from that failure." Spar v. Cha, 907 N.E.2d 974, 979 (Ind. 2009) (emphasis added) (citing Bader v. Johnson, 732 N.E.2d 1212, 1216-17 (Ind. 2000); Oelling v. Rao, 593 N.E.2d 189, 190 (Ind. 1992)). However, we do not take the language of the trial court's order to mean that the trial court did not apply this burden of proof.

We presume that trial courts know the law and apply it correctly. Holtzleiter v. Holtzleiter, 944 N.E.2d 502, 506 (Ind. Ct. App. 2011). It is quite basic law indeed that the plaintiff bears the burden of proof. Although the trial court may have used imperfect language in its findings of fact and conclusions of law, its less-than-perfect choice of words is insufficient to overcome the presumption that the court knew that the burden of proof rested with the plaintiffs. Indeed, the extensive findings of fact entered by the court

7

support this conclusion. It is more likely that the trial court was simply noting that the plaintiffs had established their prima facie case and that Dr. McDonnell's defense had failed to overcome this. In short, we are not persuaded that the trial court improperly placed the burden of proof on the defendant.

## II. Clearly Erroneous Judgment

Dr. McDonnell next claims that the trial court's judgment in favor of the plaintiffs is clearly erroneous because it is not supported by any findings of fact that Dr. McDonnell's failure to act with the proper standard of care was the cause of any injuries to Anita. Dr. McDonnell claims that there is nothing in the trial court's findings of fact and conclusions of law indicating that Anita developed meningitis based upon any act or omission on the part of Dr. McDonnell. We disagree.

Here, the trial court's findings and conclusions were extensive, and clearly set forth what the trial court determined to be Dr. McDonnell's failure to follow the requisite standard of care, i.e. directing Roy to reconnect the catheter tube himself instead of instructing him to take Anita to a nearby hospital where the reconnection could be properly performed and failing to recognize that Anita was suffering from meningitis as a result of the non-sterile reconnection of the catheter. The trial court then found that Anita had sustained damages, and listed the damages it found. Although the trial court's findings and conclusions do not explicitly state that Anita's damages were the result of Dr. McDonnell's negligence, it is clear from a reading of the findings and conclusions as a whole that the trial court concluded that Anita's damages were caused by Dr. McDonnell's negligence. Moreover, the plaintiffs note, and Dr. McDonnell does not

8

deny, that there was ample evidence from which the trial court could have concluded that Anita's damages were caused by Dr. McDonnell's negligence.

### III. Damages

Dr. McDonnell also claims that the trial court's judgment is clearly erroneous because it contains no findings to support the trial court's award of damages. Dr. McDonnell argues that the trial court's findings of fact and conclusions of law are "silent as to the amount of any medical expenses or any lost wages or the nature and extent of any mental or physical impairment incurred by Anita Harris as a result of her meningitis that is attributable in whole or in part to any failure of Dr. McDonnell to render appropriate care." Appellant's Br. p. 26. Again, we disagree.

The trial court, after concluding that Dr. McDonnell had failed to meet the requisite standard of care, then delineated what it concluded were Anita's damages, which included $48,459.41 in medical expenses, $207,829.38 in lost wages, and $200,000 for mental and physical impairment, for a total of $456,288.79. The trial court found in favor of the other defendants and found that only Dr. McDonnell had acted in a negligent manner. It was therefore unnecessary for the trial court to explicitly state which portion of the damages were attributable to Dr. McDonnell; it is obvious from the trial court's judgment that the court found that *all* of the damages were attributable to Dr. McDonnell's negligence.[4]

Still, Dr. McDonnell claims that the trial court's award of damages was improper because it was based on Plaintiff's Exhibit 16AA, to which McDonnell objected and now

---

[4] The same is true for the $75,000 for loss of consortium damages awarded to Anita's husband Roy.

claims was improper for the trial court to consider. On appeal, Dr. McDonnell states that, "absent detailed bills and authentication by affidavit for all of the medial specials claimed in Plaintiffs Exhibit 16AA and absent any agreement or stipulation as to their authenticity and admissibility, Plaintiffs Exhibit 16AA as a whole is not admissible." Appellant's Br. p. 27. In this regard, Dr. McDonnell is not so much attacking the validity of the trial court's findings regarding damages as he is attacking the admissibility of Plaintiff's Exhibit 16AA. However, he sets forth no standard of review for the admissibility of evidence, cites no evidentiary rules or case law regarding hearsay, nor does he explain precisely why and which parts of Plaintiffs Exhibit 16AA are inadmissible hearsay. We therefore consider this evidentiary argument waived. See In re Estate of Carnes, 866 N.E.2d 260, 265 (Ind. Ct. App. 2007) (noting that failure to cite case law or statutory authority in support of argument results in waiver of that argument) (citing Ind. Appellate Rule 46(A)(8)(a)); see also Kentucky Nat. Ins. Co. v. Empire Fire & Marine Ins. Co., 919 N.E.2d 565, 586 (Ind. Ct. App. 2010) (holding argument waived for failure to cite authority or provide cogent argument).

Dr. McDonnell also claims that the trial court's damages award was improper because it was not based on any findings of fact regarding the amount of damages, citing Gabriel v. Windsor, Inc., 843 N.E.2d 29 (Ind. Ct. App. 2006). In that case, we agreed with the appellant's argument that the trial court's judgment was not supported by the findings because the trial court made no findings on the issue of the damages it awarded. Id. at 49. However, in Gabriel, the trial court's judgment stated simply that the appellee was to recover judgment against Gabriel in the amount of $2,383.41 without explanation.

10

In contrast, the trial court's judgment awarded Anita $48,459.41 in medical expenses, $207,829.38 in lost wages, and $200,000 for mental and physical impairment. Had the trial court delineated these numbers as "findings," the result would be the same. We therefore cannot say that the trial court's award of damages was clearly erroneous.

## IV. Prejudgment Interest

Dr. McDonnell also claims that the trial court abused its discretion in awarding prejudgment interest in its judgment against him. Prejudgment interest represents an element of complete compensation; it is not simply an award of interest on a judgment, but rather is recoverable as additional damages to accomplish full compensation. Johnson v. Eldridge, 799 N.E.2d 29, 32 (Ind. Ct. App. 2003), trans. denied. Pursuant to Indiana Code section 34-51-4-7, a trial court "may award prejudgment interest as part of a judgment." However, the trial court may not award prejudgment interest if, within one year after the claim is filed,[5] the plaintiff fails to make a written offer of settlement to the defendant(s). Ind. Code § 35-51-4-6(1).[6]

Here, Dr. McDonnell claims that the award of prejudgment interest was erroneous because there was no proper offer to settle made by the actual plaintiff. That is, Dr. McDonnell claims that the Harrises made an offer to settle, but that the Harrises were not

---

[5] This period may be enlarged by the trial court if necessary and upon a showing of good cause. I.C. § 34-51-4-6(1).

[6] In addition, the trial court may not award prejudgment interest under this statute if "the terms of the [plaintiff's] offer fail to provide for payment of the settlement offer within sixty (60) days after the offer is accepted, and "the amount of the offer exceeds one and one-third (1⅓) of the amount of the judgment awarded." I.C. § 35-51-4-6(2), (3). Similarly, the trial court may not award prejudgment interest if, within nine months after a claim is filed, one of the defendants makes a written offer of settlement to the plaintiff, the terms of the offer include payment within sixty days after the offer is accepted, and the amount of the offer is at least two-thirds (⅔) of the amount of the judgment award. Ind. Code § 34-51-4-5.

the proper plaintiffs, and that the Harrises therefore had no right to be able to make an offer to settle.

As noted above, the Harrises filed their claim on July 28, 2003, but had jointly filed a petition for bankruptcy on May 14, 2003. The federal bankruptcy Judge granted the plaintiffs a discharge under Chapter 7 of the federal bankruptcy code in June of 2003. The parties agree that the Harrises' claim against Dr. McDonnell was therefore an asset of the bankruptcy estate and that Wissel, the trustee of the bankruptcy estate, was the proper party to prosecute the action.

Indeed, after the trial had started, the defendants filed a motion to dismiss the claims against them on the same grounds the Harrises were not the proper parties. As a result, an amended complaint was filed on May 24, 2010, substituting Wissel as the named plaintiff.[7] The defendants, including Dr. McDonnell, agreed to this substitution. But the Plaintiffs made their settlement offer on November 21, 2009, before the amended complaint naming Wissel as the plaintiff had been filed. Dr. McDonnell therefore claims that there had been no proper offer to settle because, at the time of the offer, the Harrises had no authority to make such an offer. We are constrained to agree.

To be sure, it appears that Wissel had hired the Harrises' counsel to pursue this action on behalf of the bankruptcy estate. However, this does not alter the fact that, at the time the settlement offer was made, the Harrises, not Wissel, were the named plaintiffs. Thus, Wissel, the actual plaintiff, never made an offer to settle. Because the actual

_____

[7] On November 4, 2003, Wissel, the bankruptcy trustee, asked the bankruptcy court to hire the Harrises' counsel to pursue their already-filed claim against Dr. McDonnell on behalf of the bankruptcy estate, and the bankruptcy court subsequently granted this request.

12

plaintiff never made an offer to settle, the trial court should not have awarded prejudgment interest.[8]

Nor do we think believe this to be a mere technicality. By ensuring that the proper plaintiff, i.e. the trustee of the bankruptcy estate, is the party making the settlement offer, we ensure that creditors of the bankruptcy estate are aware of both the injury claim and any settlement offer. This minimizes the possibility that an injured party could attempt to settle an injury claim, which properly belongs to the bankruptcy estate, outside of bankruptcy, precluding the bankruptcy trustee and the party's creditors from administering the injury claim and proceeds of any settlement as assets of the bankruptcy estate.

**Conclusion**

We disagree with Dr. McDonnell's claim that the trial court applied an improper burden of proof. We further disagree with his claim that the trial court's finding of damages was improper. However, we agree with Dr. McDonnell that an award of prejudgment interest was improper under the facts and circumstances of this case. We

---

[8] Dr. McDonnell claims that prejudgment interest was also improper because the Harrises' damages were not "readily ascertainable" and could not be "calculated by simple mathematical computation." See Whited v. Whited, 859 N.E.2d 657, 665 (Ind. 2007). However, our supreme court recently held that the requirement that a plaintiff's damages be "complete" and "ascertain[able] as of a particular time and in accordance with fixed rules of evidence and known standards of value," is a common-law standard and is not applicable under the tort prejudgment interest statute at issue here. Kosarko v. Padula, No. 45S03-1206-CT-310, ___ N.E.2d ___ (Ind., Dec. 12, 2012) (quoting N.Y., Chi. & St. Louis Ry. Co. v. Roper, 176 Ind. 497, 507, 96 N.E. 468, 472 (1911) (setting forth common-law standard)); see also Inman v. State Farm Mut. Auto. Ins. Co., No. 41S01-1108-CT-515, slip op. at 9 n.7, ___ N.E.2d ___ (Ind. Dec. 12, 2012) (noting that in cases involving the tort prejudgment interest statute, the common-law standard requiring damages to be complete and readily ascertainable in order for prejudgment interest to be awarded is "irrelevant to the trial court's determination.").

therefore affirm the trial court with regard to its findings of liability and damages, but reverse the trial court's award of prejudgment interest and remand with instructions that the trial court modify its judgment to eliminate the award of prejudgment interest.

Affirmed in part, reversed in part, and remanded.

VAIDIK, J., and BARNES, J., concur.