Timothy J. CLANCY, Appellant–
Respondent,

v.

Dianna GOAD and Robert Goad,
Appellees–Petitioners.

No. 45A03–0511–CV–00569.

Court of Appeals of Indiana.

Dec. 20, 2006.

Harold G. Hagberg, Matthew D. LaTulip, Hagberg LaTulip, Schererville, IN,

Robert B. Clemens, Bryan H. Babb, Peyton L. Bergm, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Appellant.

Terrence M. Rubino, Steven J. Sersic, Rubino, Ruman, Crosmer, Cerven, Smith & Sersic, Dyer, IN, Attorneys for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

Timothy Clancy appeals the jury verdict awarding Dianna and Robert Goad damages stemming from an accident where Clancy's truck collided with Dianna's motorcycle. The jury awarded Dianna $10 million for injuries including the loss of her left leg, and Robert, who witnessed the accident, received $1 million for his claim of negligent infliction of emotional distress. Clancy argues that both awards are excessive in light of the evidence presented at trial and that the trial court erred when it instructed the jury on the modified impact rule with respect to Robert's claim. We find, as to both Dianna and Robert, that the jury's awards for damages are reasonable in light of the evidence presented at trial. We also find that Robert sustained an "impact" for purposes of the modified impact rule when he chose to execute an emergency maneuver with his motorcycle in order to help his wife and that maneuver resulted in him falling to the asphalt and sustaining minor injuries. As such, the trial court was correct to instruct the jury on the application of the modified impact rule. We therefore affirm in all respects.

### Facts and Procedural History

In May 2002, Tim Clancy was employed as president of Action K–9 Security, Inc., a company that provided guard dogs to businesses for security purposes. On May 27, 2002, Clancy received a call that he was needed at a business in Chicago, Illinois, where a dog had apprehended an intruder. Clancy awoke between 3:00 and 3:30 a.m. and went downstairs in his house. Clancy inadvertently awakened his sixteen-year-old son, Josh, who asked permission to accompany his father to Chicago, and Clancy agreed. The two left for Chicago in Clancy's black Chevrolet S–10 pickup truck. After retrieving the guard dogs, the men went to the local police station so that Clancy could assist detectives in the filing of a police report.

Clancy and Josh then ran a couple of errands and Clancy began driving home on State Road 231.[1] Robert and Dianna Goad were traveling in the opposite direction on State Road 231, each on separate motorcycles. While driving, Clancy fell asleep at the wheel of the truck. The truck crossed the center-line of State Road 231 and, after narrowly missing two other vehicles and Robert's motorcycle, collided with Dianna's motorcycle. The collision severed Dianna's leg above the knee, and she was thrown from her motorcycle into a water-filled ditch at the side of the road. Clancy was awakened by the sound of the impact, and the truck veered into the ditch, as well.

After swerving on his motorcycle to avoid Clancy's truck, Robert heard the truck hit Dianna's motorcycle. He looked back and saw his wife fly from her bike,

---

1. Both Clancy and Josh testified that Josh drove the entire trip home. However, several witnesses at trial testified that Clancy was in the driver's seat at the time of the accident, and the jury's verdict clearly indicates that the jury determined Clancy to be the driver.

Though we refer to the Goads' claims against both Clancy and Josh *infra* when discussing the underlying case, Clancy does not challenge the jury's finding regarding this issue on appeal.

and he noticed a white flash around her leg that he later realized was actually the bone extending approximately three inches from where Dianna's leg had been torn off. Rather than braking slowly on his motorcycle, Robert hit the bike's "kill switch" and performed a controlled slide maneuver to lay it on its side and bring it to a stop quickly. In doing so, Robert twisted his knee and received several scrapes and bruises from his impact with the pavement. Robert immediately ran to Dianna's aid and held her head out of the water-filled ditch. In the meantime, Clancy and Josh exited their truck and, seeing Dianna's injuries, Clancy phoned 911 on his cellular phone. Paramedics arrived shortly thereafter, and Dianna was transported to a hospital.

Robert refused medical treatment at the scene of the accident, and his injuries improved over approximately five days without treatment. Dianna, however, remained in a coma for approximately two weeks following the accident. In addition to the loss of her leg, Dianna also suffered from a fractured pelvic bone, a fractured left elbow, and a lacerated spleen, which had to be removed.

In September 2003, the Goads filed a claim and request for a jury trial against Clancy, Josh, and Action K–9 Security, Inc. Following numerous interim filings, on April 15, 2004, the Goads filed their Second Amended Complaint. In Count I, Dianna alleged negligence, recklessness, and willful and wanton misconduct against Clancy and Josh, depending upon the identity of the driver. If Josh was the driver, Dianna also alleged negligent entrustment against Clancy. In Count II, Robert incorporated the same claims from Count I against either Clancy or Josh and added

his own claims for loss of consortium and negligent infliction of emotional distress. In Count III, the Goads incorporated the same allegations from Count I and asserted that Clancy's employer, Action K–9 Security, Inc., was liable for Clancy's negligent actions. Action K–9 Security, Inc. filed a Motion to Dismiss on July 15, 2004, which was granted without prejudice on July 16, 2004.[2]

A three-day jury trial commenced on September 21, 2005. At the close of the Goads' case-in-chief, counsel for Clancy moved for judgment on the evidence as to Josh only and on the Goads' negligent entrustment claims against Clancy. The trial court denied the former but granted the latter. At the end of the trial, counsel for Clancy objected to Final Jury Instruction No. 14, which instructed the jury on a negligent infliction of emotional distress claim under Indiana's modified impact rule.

> If the plaintiff sustained a direct impact and by virtue of that direct impact plaintiff suffered serious emotional trauma which would normally be expected to occur to a reasonable person, then the plaintiff may recover for that emotional trauma without regard to whether any physical injury occurred.

*Id.* at 84. Counsel for Clancy argued that the instruction was inappropriate because the modified impact rule did not apply to either Robert or Dianna. The trial court overruled this objection. The trial court also instructed the jury on Indiana's bystander rule, which provided:

> A plaintiff who actually witnessed or comes upon the scene of an accident soon after the death or severe injury of a loved one may recover for the emo-

---

**2.** On August 8, 2005, Clancy's insurer, Allstate Insurance Company, filed a motion to intervene. Following a hearing on the mo-

tion, it was denied by the trial court for reasons not stated in the record.

tional trauma which would normally be expected to occur in a reasonable person without regard to whether any physical injury occurred to the plaintiff.

*Id.* at 85 (Final Jury Instruction No. 15). Clancy did not object to this instruction.

The jury returned verdicts finding Clancy one hundred percent at fault for the accident and, correspondingly, finding Josh, Robert, and Dianna each zero percent at fault. Dianna and Robert were awarded $10 million dollars and $1 million, respectively, in compensatory damages.[3] On October 21, 2005, Clancy filed a Motion to Correct Errors, which the trial court denied. This appeal now ensues.[4]

### Discussion and Decision

On appeal, Clancy contends that the damages awarded to both Dianna and Robert are excessive and unreasonable in light of the evidence presented at trial. In addition, he contends that the trial court erred when it instructed the jury on the modified impact rule.

Clancy acknowledges the fact that Dianna was seriously and permanently injured from the accident and that Robert has suffered emotional and mental anguish as a result of his involvement at the scene. However, Clancy maintains that the damages awarded to Dianna and Robert are excessive in light of the evidence presented and were motivated by passion, prejudice, or partiality as a means to punish Clancy for attempting to frame his son, Josh, as the driver. He asks that we remand the case for a new trial on damages.

 "Broadly stated, the person injured by the negligence of another is entitled to reasonable compensation." *Ritter v. Stan-*

ton, 745 N.E.2d 828, 843 (Ind.Ct.App. 2001), *trans. denied.* "Reasonable compensation" refers to an amount that would reasonably compensate the plaintiff for bodily injury and for pain and suffering. *Id.* It also takes into account past, present, and future expenses reasonably necessary to the plaintiff's treatment and all financial losses suffered, or to be suffered, as a result of the inability to engage in his or her usual occupation. *Id.*

 When reviewing a jury verdict containing a damage award claimed to be excessive or inadequate, we consider only the evidence that supports the award together with the reasonable inferences therefrom. *Id.* If there is any evidence to support the amount of the award, even if it is conflicting, this court will not reverse. *Id.* "A jury determination of damages is entitled to great deference when challenged on appeal." *Sears Roebuck & Co. v. Manuilov,* 742 N.E.2d 453, 462 (Ind. 2001).

 "This discretion is not limitless, however. [We] will set aside an award of compensatory damages as impermissibly excessive where it is apparent from a review of the evidence that the amount of damages is so great it cannot be explained upon any basis other than passion, partiality, prejudice, corruption, or some other improper element." *Ritter,* 745 N.E.2d at 843–44. To warrant reversal, the award "must appear to be so outrageous as to impress the Court at first blush with its enormity." *Id. (quoting Kimberlin v. De-Long,* 637 N.E.2d 121, 129 (Ind.1994) (quotation omitted)). Still, "[t]he jury's damage award will not be deemed the result of

---

3. Before the trial began, Robert and Dianna withdrew their requests for punitive damages.

4. Allstate Insurance Company also filed an appeal of the trial court's ruling. On May 10, 2006, however, this Court found that the in-

surer, having been denied its motion to intervene and therefore not having been a party to the proceedings below, is not a party to this appeal, either.

improper considerations if the size of the award can be explained on any reasonable ground." *Id.* Further, "[w]hen the evidence concerning the injury and damages is conflicting, the jury is in the best position to assess the damages and the jury's verdict cannot be said to be based upon prejudice, passion, partiality, corruption, or on the consideration of some improper element." *Id.* Our Supreme Court has summarized this standard as follows:

> A personal injury award is not excessive where (1) the award was not based upon jury prejudice, partiality, or corruption, (2) the jury has not misunderstood or misapplied the evidence, (3) the award was not based upon consideration of an improper element such as liability insurance, and (4) the award was within the parameters of the evidence. Under such circumstances, we will not substitute our judgment for that of the jury as to reasonable compensation for a plaintiff.

*Id. (citing Kimberlin,* 637 N.E.2d at 130 (citation omitted)).

## I. Dianna's Injuries and Damages

■ The record indicates that before the accident, Dianna was an active and athletic person. She was an avid runner, often jogging three-and-a-half miles a day. Tr. p. 313. She belonged to a health club where she regularly trained with free weights. *Id.* She often engaged in these activities with her adult son, Colin. *Id.* Dianna enjoyed rollerblading, hiking, and cross-country skiing, activities in which both Colin and Robert regularly joined her. *Id.* at 314. In addition, Colin described Dianna as "very house proud," and he indicated that she always did all of the housework, cooking, cleaning, and other domestic chores for the family, as well as handled all of the finances. *Id.* at 314–15. Dianna also worked full-time in a managerial accounting position where she earned approximately $45,000.00 per year and where she planned to work until her retirement. *Id.* at 425–26.

The injuries Dianna received in the accident as a result of Clancy's negligence were catastrophic. Several volumes of medical evidence were admitted at trial to demonstrate the extent of Dianna's injuries and the recovery process she has suffered through. *See* Exs. 24, 29, 32–34. Dianna, her treating physician, and members of her family all testified regarding her injuries and the effect those injuries have had and will continue to have on her life. She spent two weeks in a coma. Tr. p. 312. Surgeries were performed to medically amputate her leg above the knee and to set her broken pelvic bones and her broken elbow. *See id.* at 275, 281. Dianna's spleen could not be repaired and was inevitably removed, resulting in an increased lifetime risk of infection. *Id.* at 290–91. In fact, Dianna required treatment for a severe infection while still in the hospital recovering from her injuries. *Id.* at 356. Also, Dianna has endured multiple skin graft procedures and extensive physical therapy. *Id.* at 283, 301–02. At the time of the trial, Dianna had undergone seven surgeries, taken more than 6400 pills, and her medical expenses totaled more than $368,000.00. *Id.* at 429–31; Exs. 30, 32–33.

Furthermore, Dianna's medical expenses and challenges continue and are expected to continue indefinitely. She experiences "phantom limb pain," where she feels shooting pains and discomfort in her missing leg. Tr. p. 276. The frequency and intensity of her phantom limb pain has decreased over time and with the use of medication, but it still bothers Dianna and requires ongoing pharmaceutical control. *Id.* at 433–34. She also experiences a great deal of pain and discomfort in the remaining portion of her amputated leg

and stiffness and pain in her arm, and she takes regular doses of pain medication to control these symptoms. *Id.* at 277, 431–34, 437. Dianna also has suffered from depression and anxiety since the accident, and she takes medication for these illnesses, as well. *Id.* at 303, 431.

In addition, Dianna has been fitted with a "C-leg," a computerized prosthetic leg. *Id.* at 299. Dianna's treating physician, Dr. Todd A. Kuiken, testified that the cost of this prosthesis is currently between $40,000.00 and $70,000.00. *Id.* at 300. A C-leg needs to be replaced every three to five years at full cost, *id.*, and the trial court took judicial notice that Dianna's life expectancy is 35.4 years, *id.* at 473–74.

Moreover, while the C-leg is an advanced prosthetic device, Dianna must deal with the inconvenience and burden of its use. Because Dianna cannot "feel" the C-leg, she is often unable to recognize the position of her artificial foot or to judge the extent to which she has gained her footing on a solid surface. *Id.* at 319, 436. This, in addition to the fact that her center of gravity has changed since the loss of her leg, leaves her prone to falls and significantly limits her agility, speed, and balance when walking. *Id.* at 436. The C-leg must be recharged every night, during which time Dianna is required to use her wheelchair or hop on her right leg in order to get around. *Id.* at 320. As with any prosthesis, the fit of the C-leg is imperfect, and it often rubs the remaining area of Dianna's amputated leg to which it attaches. *Id.* at 432–33. Because the skin there is rough and scarred, the prosthesis pushes and pulls on the edges of the skin, often chafing or tearing the tissue, resulting in pain and bleeding. *Id.* For this reason, Dianna is unable to wear the C-leg for long periods of time or to be overly active while wearing it. She often leaves it

off on weekends to give her amputated leg time to rest and heal. *Id.* at 320–21.

Dianna is unable to engage in many of the activities she enjoyed so much before the accident, and she has been forced to drastically alter the way she approaches those in which she can participate. She can no longer run because she is so prone to falling, she cannot lift weights like she used to, she cannot rollerblade or ski with her family, and her stamina and ability to walk or hike has been greatly decreased. *See id.* at 322–23. Dianna is unable to sit or remain in one position for very long, and because of this she was unable to return to her accounting job. *Id.* at 454. To her great credit, Dianna has used her tragic experience to inspire and help others now as a physical therapist. *Id.* at 426. However, because she is only able to work a limited number of hours since the accident, she makes only $12,000.00 per year in this position, representing an income loss of $33,000.00 per year for a woman only forty-nine years old. *See id.*

Dianna's social and interpersonal interactions have changed as a result of the accident, as well. Her son described her as once being a person who took great pride in her appearance but who now feels unattractive and embarrassed to be seen in public. *Id.* at 325. She is unable to do housework and other chores she used to do, and those that she can do take much longer than before and often involve several accidents. *Id.* at 316. Dianna also remarks that it is difficult for her to watch the effect the accident has had on her husband, noting that he is very depressed and unmotivated and has been changed as a person by his response to her accident. *Id.* at 432. At trial, she stated, "I miss my husband. It's not—it's not going the way that it used to be." *Id.* at 440. In short, every aspect of Dianna's daily life has been

radically changed as a result of the accident.

"The jury's damage award will not be deemed the result of improper considerations if the size of the award can be explained on any reasonable ground." *Ritter*, 745 N.E.2d 828 (finding an award of $55 million to a man whose midsection was crushed by a truck to be reasonable based on the extensive evidence of his devastating injuries and ongoing complications and recovery). The record before us is replete with evidence of devastating injuries, permanent disabilities, and continuing pain and suffering on the part of a woman who once enjoyed an active and athletic lifestyle. The evidence further demonstrates ongoing and considerable financial ramifications resulting from this unfortunate accident. Moreover, Clancy's insistence that the jury punished him for framing his son as the driver responsible for the accident is pure conjecture. We see no tangible indication that the jury acted out of prejudice, passion, or partiality to punish Clancy. Although the amount of the award in this case is sizeable, we cannot conclude that it is unreasonable given the evidence. *See Ritter*, 745 N.E.2d 828.

## II. Robert's Injuries and Damages

Unlike Dianna, Robert did not seek recovery for any direct physical injuries he sustained in the accident. Rather, his claim was for negligent infliction of emotional distress stemming from his involvement in the accident wherein he witnessed Dianna's injuries. The trial court instructed the jury that Robert could recover if he met the requirements of either the modified impact rule, *see* Appellant's App. p. 84 (Final Jury Instruction No. 14), or the bystander rule, *see id.* at 85 (Final Jury Instruction No. 15).

## A. Jury Instruction on The Modified Impact Rule

As a preliminary matter, Clancy argues that the trial court erred in giving Final Jury Instruction No. 14 on the modified impact rule. To reiterate, the instruction provided:

> If the plaintiff sustained a direct impact and by virtue of that direct impact plaintiff suffered serious emotional trauma which would normally be expected to occur to a reasonable person, then the plaintiff may recover for that emotional trauma without regard to whether any physical injury occurred.

*Id.* at 84. Clancy's counsel objected to the instruction on the following grounds:

> COUNSEL: With regard to [Robert], I don't think he qualifies for a modified impact emotional distress claim, because he didn't suffer any impact. He avoided the impact, and he testified he laid his bike down, not because he had to but because he was in a hurry to get back and see how his wife was doing.

> * * * * * *

> COUNSEL: My objection is it's a correct statement of the law, but it doesn't apply in this case to Dianna because she had an impact. She had a physical injury. The modified impact rule goes to somebody who has an impact but no physical injury. And with regard to Robert, he didn't have a physical injury, but he didn't have an impact either.

Tr. p. 650–53. In addition to the grounds cited at trial, Clancy argues on appeal that the jury should not have been instructed on the modified impact rule because the evidence at trial indicated that Clancy was negligent as to Dianna, but Robert failed

to present evidence that Clancy was negligent as to him *personally*.[5]

This latter argument was not raised at the trial level and is therefore waived. Waiver notwithstanding, we cannot agree with Clancy's argument that Robert was required to present additional evidence demonstrating Clancy's negligence as to him, personally, in order to warrant instruction on his claim for negligent infliction under the modified impact rule. Robert's claim arose in the joint trial of his and Dianna's claims, both arising from the same series of events. The jury clearly found in favor of Dianna on the issue of negligence, a finding Clancy does not contest. This finding, then, provided Robert with proof of negligence in the tort *underlying* his negligent infliction claim and, consequently, with an adequate foundation upon which to base his recovery.

With respect to Clancy's argument that the trial court erred when instructing the jury on the modified impact rule because Robert did not sustain an impact, we must determine the nature of Robert's involvement in the accident. At trial, Robert testified that after swerving to avoid Clancy's truck, he intentionally laid his bike down in an emergency maneuver so that he could quickly get to his wife's side. Tr. p. 394–95. In doing so, Robert twisted his knee and scraped and bruised his leg when he came into contact with the pavement. *Id.* at 397–98. Clancy argues that Robert's impact does not qualify him for application of the modified impact rule because "Robert was not a primary victim of the negligent conduct who suffered a direct impact as a result of a negligent act." Appellant's Br. p. 25 (citations omitted). Instead, he argues that because Robert *chose* to lay his bike down and because he never came into direct contact with Clancy or the truck, he was not directly impacted in the accident as is required for application of the modified impact rule. *Id.*; Appellant's Reply Br. p. 9–10.

Both parties cite the case of *Conder v. Wood*, 716 N.E.2d 432 (Ind.1999), in support of their positions. In that case, Wood was walking with her friend, Brittain. Conder struck Brittain with his truck while driving through an intersection, and Brittain fell into the street. Fearing that

---

5. In support of this argument, Clancy cites *Doe v. Lafayette School Corp.*, 846 N.E.2d 691, 701 (Ind.Ct.App.2006), *reh'g denied*, for the proposition that negligent infliction of emotional distress is not an independent tort. We recently addressed this issue in *State Farm Mutual Auto. Insurance Co. v. Jakupko*, 856 N.E.2d 778 (Ind.Ct.App.2006), *trans. pending*. In that case, the Court recognized that *Doe* and the case upon which it relied, *Ryan v. Brown*, 827 N.E.2d 112, 118 (Ind.Ct.App. 2005), both directly state that negligent infliction of emotional distress is not an independent tort. *Jakupko*, 856 N.E.2d at 782. However, the panel in *Jakupko*, which notably included Judge Robb—the author of *Ryan*— and Judge Sharpnack—a panelist on *Ryan*— clarified our position on negligent infliction of emotional distress in those decisions. The Court noted:

> To the extent that this court, in *Doe*, misunderstood the discussion of this issue in *Ryan*, we hereby reiterate that a negligent infliction of emotional distress claim is an independent tort. In *Ryan*, we did not hold otherwise, but merely discussed the appellees' assertion that negligent infliction of emotional distress claims depended on the success of an underlying negligence claim. Because our discussion on that point in *Ryan* is somewhat confusing, especially given the caption entitled "Negligent Infliction of Emotional Distress is Not an Independent Tort," it is not surprising that *Doe* misconstrued that discussion.

*Id.* at n. 2. *Jakupko* goes on to reference the holdings of the Indiana Supreme Court in *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind.1991), and *Groves v. Taylor*, 729 N.E.2d 569, 573 (Ind.2000), cases which acknowledged negligent infliction of emotional distress as a distinct cause of action under the modified impact rule and the bystander rule, respectively. *Id.* at 782–83.

Conder's truck would hit Brittain again as it moved forward, Wood pounded on the side of the truck in an attempt to get Conder's attention. Brittain died at the scene, and Wood later sued Conder for, among other things, negligent infliction of emotional distress. The trial court denied Conder's motion for summary judgment. Upon transfer, our Supreme Court discussed the modified impact rule from *Shuamber*, and stated that the rule "maintains the requirement of a direct physical impact." *Conder*, 716 N.E.2d at 434. Addressing Wood's claim that she sustained a direct impact by voluntarily pounding on the side of the truck, the Court stated:

> "[D]irect impact" is properly understood as the requisite measure of "direct involvement" in the incident giving rise to the emotional trauma. Viewed in this context, we find that *"it matters little how the physical impact occurs, so long as that impact arises from the plaintiff's direct involvement in the tortfeasor's negligent conduct."*

*Id.* at 435 (emphasis added). Citing Judge Barteau's dissent in the underlying Court of Appeals case, the Court goes on to state in a footnote to this language:

> We also note that the actual language of the rule announced in *Shuamber* merely requires a plaintiff to sustain a direct impact by the negligence of another, *but imposes no requirement that the impact be initiated by the tortfeasor.* "The majority reads into the *Shuamber* standard a limitation which cannot be found in the language of that standard and which is not required by the rationale underlying the modification of the impact rule in that decision."

*Id.* at n. 3 (citation omitted). The Court held that "Wood clearly sustained an 'impact'" by pounding on the truck and so affirmed the denial of summary judgment to Conder. *Id.*

Robert points to the holding in *Conder* to support his contention that although he chose to execute the emergency maneuver that resulted in his impact, he did so as a result of his direct involvement in the accident and therefore is entitled to the application of the modified impact rule. Clancy, on the other hand, argues both that Robert's behavior was so deliberate as to remove it from the rule and that Robert cannot benefit from the rule because his "purported impact was between his feet and the highway and not with the object or individual directly responsible for the harm to Dianna." Appellant's Reply Br. p. 10. This latter contention attempts to distinguish *Conder* from the present case by arguing that the plaintiff in *Conder* sustained an impact even though she chose to pound on the truck because the truck was the object that struck her friend. As we read *Conder*, Clancy's arguments seem to fly in the face of the rationale underlying the modified impact rule as expressed by the Indiana Supreme Court.

The Court in *Conder* stated, "it matters little how the physical impact occurs, so long as that impact arises from the plaintiff's direct involvement in the tortfeasor's negligent conduct," 716 N.E.2d at 435, and they adopted Judge Barteau's suggestion that there is "no requirement that the impact be initiated by the tortfeasor," *id.* at n. 3. This is consistent with the policy behind the modified impact rule, which was later summarized by the Indiana Supreme Court in *Groves:*

> [T]he reason for requiring direct involvement is to be able to distinguish legitimate claims of emotional trauma from the mere spurious. The value of requiring "direct impact" is that it provides clear and unambiguous evidence that the plaintiff was so directly involved in the incident giving rise to the emo-

tional trauma that it is unlikely that the claim is merely spurious.

729 N.E.2d at 572. Further, in its most recent decision involving the modified impact rule, our Supreme Court recalled the following guideline to be followed when assessing a plaintiff's impact claim:

> [W]hen the courts have been satisfied that the facts of a particular case are such that the alleged mental anguish was not likely speculative, exaggerated, fictitious, or unforeseeable, then the claimant has been allowed to proceed with an emotional distress claim for damages even though the physical impact seemed to have been rather tenuous.

*Atl. Coast Airlines v. Cook*, 857 N.E.2d 989, 996, (Ind., 2006) (citing *Bader v. Johnson*, 732 N.E.2d 1212, 1221 (Ind.2000)).

 These decisions support Robert's argument that his impact resulted from his direct involvement in the accident in which Dianna was injured. Clancy nearly hit Robert only moments before he hit Dianna, and it was only Robert's ability to swerve out of the way while maintaining control of his motorcycle that prevented this. Robert then heard the truck hit Dianna and saw his wife thrown from her motorcycle, at which point he hit the kill switch on his bike and slid it to a stop so that he could get to Dianna as quickly as possible. All of this happened in a matter of only a few seconds. This demonstrates a sufficient level of involvement in the tortfeasor's negligent conduct to support a trial court's instruction on the modified impact rule.

Likewise, Clancy's argument that the plaintiff in *Conder* met the "direct involvement" test for purposes of the modified impact rule while Robert failed to do so conflicts with the reasoning of our Supreme Court. By instructing that our focus need not be on the manner in which an impact occurs or which party initiated the impact, *Conder* contradicts Clancy's notion that the rule should be limited to direct contact with the object or tortfeasor involved in the underlying negligence claim. Clancy points to no language by this Court or our Supreme Court suggesting such a limitation. We find it implausible that *Conder* could stand for the proposition that a plaintiff who intentionally pounds her hand onto the body of a vehicle has sustained an impact but that a plaintiff who intentionally executes an emergency maneuver on his motorcycle and twists his knee in doing so does not when both plaintiffs acted only to aid his or her injured loved one.[6]

In light of all of the above considerations, we find that it was proper for the trial court to instruct the jury on the modified impact rule as a potential avenue by which Robert could be entitled to recover from Clancy. We therefore must address the reasonableness of the jury's award of damages on Robert's claim.

### B. Reasonableness of Award to Robert

 As with Dianna's claim, Clancy insists that the damages awarded to Robert are excessive in light of the evidence presented and were motivated by passion, prejudice, or partiality in order to punish Clancy for attempting to frame Josh. We

---

6. The bystander rule also relies on a finding of "direct involvement," with the difference being that no impact need be demonstrated in order to trigger the rule. *See Groves*, 729 N.E.2d at 572–73. The language of the Indiana Supreme Court in both *Conder* and *Groves*, however, is clear that the concept of "direct involvement" is relevant to both the modified impact and bystander rules. It is worth noting that Clancy does not challenge the trial court's instruction on the bystander rule and so acquiesces to its application.

apply the same standard and address the same considerations here, then, as we did when examining Dianna's award.

Like his wife, Robert was an active person before the accident. He engaged in a variety of athletic activities and was happily married. Robert's present difficulties stem from his reaction to his wife's injuries and his memories of the events at the scene of the accident. Robert witnessed the accident from an extremely close vantage point after only narrowly avoiding a collision himself. As he watched his wife fly through the air after being hit, he saw a flash of white bone coming from her severed leg. He ran to her side and held her head out of the water in the ditch to prevent her from drowning. He heard her screaming and saw the muscle and bone exposed at the site of her amputation. He watched her fade in and out of consciousness, and he believed she was going to die. Tr. p. 347–48. After the ambulance took Dianna from the scene, Robert collapsed in the road and had to be carried to a car by his stepson, Colin, and Colin's fiancée. Robert commented that these events, to him, were "like being in a war." *Id.* at 347.

As a result of his presence at the scene, Robert has developed post-traumatic stress disorder ("PTSD"). Robert testified that "not a day goes by that I don't relive, review [the accident and the aftermath] just like a video." *Id.* at 377. He described his recall of the events in the following passage of testimony:

> Watch this whole accident again; watch Dianna get hit, see the headlight of that truck, see her body go through the air, see that three inches of bone sticking out of her knee, see her swollen, nine IV's, nine lines into her, her body weeping fluid.

*Id.*

Dianna testified regarding the changes she has noticed in Robert as a result of his PTSD, noting, "[M]y husband has changed as an individual. He's not the person he was three years ago in my perception. There's a great deal more depression. There's not as much motivation to him." *Id.* at 432. She goes on to state, "I miss my husband. It's not—it's not going the way that it used to be." In order to cope with his symptoms, Robert receives regular counseling and takes anti-anxiety and anti-depression medication.

Comparing the award in this case to other cases, Clancy argues that although Robert's condition may warrant some form of recovery, the damages awarded by the jury are excessive and unprecedented in Indiana for a plaintiff alleging only a negligent infliction of emotional distress claim. It is true that a $1 million award for negligent infliction is unprecedented, but as is clear from Clancy's brief, the issue has only rarely come before our appellate courts. Clancy cites only one case, *Dollar Inn, Inc. v. Slone,* 695 N.E.2d 185 (Ind.Ct. App.1998), *reh'g denied, trans. denied,* where we upheld an award of $250,000.00 for negligent infliction where the plaintiff was pricked by a hypodermic needle hidden in a roll of toilet paper, and the plaintiff subsequently feared that she had been exposed to the HIV virus.[7]

---

**7.** Clancy also cites *Kimberlin v. DeLong,* 637 N.E.2d 121 (Ind.1994), affirming an award of $360,000.00 based on a wife's injuries in an accident in which both she and her husband were injured. However, the wife in *Kimberlin* recovered that amount for her own personal injuries, along with $1.25 million in a wrongful death action based on her husband's injuries. Her claim was not for negligent infliction of emotional distress, and her injuries were substantial and required a two-week hospital stay and physical therapy. *Kimberlin* is not relevant to the issue before us.

Clancy's argument on this point cannot be sustained. First, even if it were proper to compare awards from different cases to assess reasonableness, we simply do not have a substantial body of case law available on the issue of damages for the negligent infliction of emotional distress from which to draw a valid conclusion.

 Of even greater weight, however, is the fact that we have previously held that it is not ordinarily proper to evaluate a jury award of damages using a comparability analysis. Assessing a $55 million personal injury award, the Court in *Ritter* undertook a thorough review of the matter and, while noting the potential usefulness of a comparability analysis, concluded: "It is clear that Indiana courts have not previously adopted a comparability analysis for evaluating compensatory damage claims. More importantly, they have historically expressed disfavor in evaluating cases other than on their own merits." 745 N.E.2d at 847. The *Ritter* Court recognized that a comparative analysis could be useful to evaluate a particular type of damages or to determine if an award demonstrates jury passion or prejudice, but it also warned against the temptation to employ such an analysis unless absolutely necessary. *See id.* at 849. Turning to the facts of that case, the Court went on to say that even though the award in *Ritter* was of an unprecedented and exceptionally large amount, the evidence was sufficient to support the award without a comparability analysis.

As in *Ritter*, there is evidence in the record before us to support a jury verdict in favor of Robert. Robert was involved in Dianna's accident and witnessed her injuries first-hand when she was thrown from her bike and when he ran to her side. He replays these events in his mind and manifests the severe depression and anxiety classically associated with PTSD. His wife describes him as a completely different person since the accident and acknowledges that his symptoms have so affected him that she "misses" her husband. Evidence was presented that Robert is undergoing counseling and is taking medication for his condition. Further, as stated in our discussion regarding Dianna's award, there is simply no evidence to support Clancy's claim that the jury sought to punish him for framing Josh as the driver of the truck. Without such evidence and considering only the evidence that supports the jury's award, we cannot substitute our judgment for that of the jury. We cannot conclude that this award is unreasonable given the evidence. *See Ritter*, 745 N.E.2d 828.

Having addressed all of Clancy's claims brought on appeal, we affirm the jury's damages awards to Dianna and Robert.

Affirmed.

BAKER, J., and CRONE, J., concur.