

FILED

Jan 18 2017, 8:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffrey C. Gerish
Plunkett Cooney
Bloomfield Hills, Michigan

ATTORNEYS FOR APPELLEE

Douglas D. Small
Edmond W. Foley
Foley & Small
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

The Estate of Gary Pfafman,

*Appellant-Defendant,*

v.

Lori Lancaster, Individually, and as Guardian of the Estate of Kole Craig,

*Appellee-Plaintiff.*

January 18, 2017

Court of Appeals Case No.
57A03-1603-CC-516

Appeal from the Noble Circuit Court

The Honorable G. David Laur, Judge

Trial Court Cause No.
57C01-1306-CC-30

**Najam, Judge.**

## Statement of the Case

[1] The Estate of Gary Pfafman ("Pfafman's Estate") appeals the trial court's grant of a new trial following a jury verdict in favor of the Estate on a complaint filed by Lori Lancaster, Individually and as Guardian of the Estate of Kole Craig ("Craig's Estate"). Pfafman's Estate presents two issues for our review, one of

which is dispositive, namely, whether the trial court complied with the requirements of Indiana Trial Rule 59(J) when it ordered a new trial on the grounds that the verdict was against the weight of the evidence and that the evidence was insufficient to support the jury's verdict. We reverse.[1]

## Facts and Procedural History

[2] In 2004, Roger Diehm had a feed barn[2] ("the barn") built on his farm in Noble County. Diehm asked his brother-in-law Pfafman, an electrician and sole proprietor of a small business doing electrical work, for help with the electrical work in the barn. Through a bartering arrangement, Pfafman agreed to help Diehm. Diehm, who had previously worked as a general contractor and developer, assisted Pfafman with some aspects of the electrical work in the barn. Diehm began the work by himself when he "ran the trenching and got all the electrical to the barn." Tr. at 702. Diehm did "80 to 90 percent" of the electrical work in the new barn by himself. *Id.* at 954. Pfafman then "set the panel" and installed the lights. *Id.* at 702.

[3] In particular, Pfafman: purchased and installed a service panel box and circuit breakers for the barn; connected the panel box to the power line running to the barn from an old barn; installed junction boxes in the barn; installed a ground

---

[1] We heard oral argument in this case on November 21, 2016.

[2] The barn is also referred to as a hay barn.

wire and ground rod[3]; installed electrical switches, including ground fault circuit interrupter ("GFCI" or "GFI") plugs; and installed all of the electrical connections. At that time, in 2004, Diehm did not need electricity to run to two water troughs located in the barn, but "he wanted wires run back" to the troughs in the event that he would install de-icing units ("de-icers") for the troughs at some time in the future. *Id.* at 485. Accordingly, Pfafman installed "a ten-foot piece of pigtail that [he] rolled up and taped and fastened" in a junction box.[4] *Id.* at 488. Pfafman told Diehm that the pigtail "wasn't GFI[-]protected and it should [be] GFCI protected before [doing] anything down in there." *Id.* at 485.

[4]     In 2007, Diehm, without consulting Pfafman or requesting help, purchased and installed de-icers for the water troughs in the barn. The instruction booklets for the de-icers stated in relevant part that, when installing the de-icers, "a qualified electrician [shall] install a properly grounded receptacle outlet" to the heater. *Id.* at 249. Despite that instruction, and despite Pfafman's instructions in 2004 that Diehm would have to install GFCI protection if he ever installed de-icers, Diehm did not install GFCI protection for the de-icers. Diehm also reversed the positive and negative wiring to one of the connectors to the de-icers. And Diehm left the de-icers in the troughs and plugged in year-round, contrary to the instruction on the de-icers' labels, which stated that they should be "store[d]

---

[3]  Diehm confirmed that Pfafman grounded the panel box.

[4]  The parties do not define "pigtail" in this context.

indoors after [the] winter season," and the written instructions for the de-icers, which stated that the units should be unplugged "when not in use or before removal from the tank." *Id.* at 248, 250.

[5] During the evening of July 28, 2010, then sixteen-year-old Kole Craig was socializing with Diehm's children at the Diehm home on the farm. A severe thunderstorm had passed through the area earlier that day, including "a really big strike" of lightning nearby. *Id.* at 137. In fact, at approximately 4:00 that afternoon, lightning struck a tree on the farm, and Diehm had noticed that the lightning strike "had burnt up an outlet or two in the kitchen." *Id.* at 942. And at some point during the evening, Diehm's daughter Lynn was in the house when her little brother Samuel told her that there was a dead heifer near the barn. Lynn decided to go check on the heifer, and Craig volunteered to go with her.

[6] Lynn and Craig made their way to the barn and went inside. They could see the heifer lying on the ground outside the "head gates" to the barn. *Id.* at 121. Lynn started to move towards the heifer, but Craig stopped her and told her that he would check on it. So Lynn backed up, and Craig "grabbed onto the head gate and was like leaning and he stopped." *Id.* After a short time, Lynn noticed that Craig was not moving, and she asked him if he was okay. Craig did not respond, so Lynn touched him and felt a "vibration." *Id.* at 122. Lynn soon realized that Craig was "getting shocked" and she "pulled him off" and "laid him down" on the ground. *Id.* Lynn saw blood coming out of Craig's mouth, and Craig did not have a pulse. Lynn had "accidentally called" her

mom on her cell phone during that time, so Lynn's mom heard everything and called 9-1-1. *Id.*

[7]     Emergency medical technicians arrived and transported Craig to a hospital in Fort Wayne, and Craig was ultimately transported to Riley Hospital for Children in Indianapolis. Craig had sustained an electric shock, which caused him to go into "full cardiac arrest" and ventricular fibrillation.[5] *Id.* at 149. As a result, Craig suffered a severe, permanent anoxic brain injury, and he was comatose for several days. Craig underwent months of therapy for cognitive, memory, executive functioning, and processing deficits.

[8]     An investigation into what caused the electric shock revealed several factors that contributed to the short-circuiting of the de-icer and electrification of the head gates. A summary of the results of that investigation is as follows:

> During the midafternoon of July 28, 2010, thunderstorms passed through Noble County, including over the Diehm farm. The Diehm farm experienced several lightning strikes, including one by a tree near the Diehm's home. It was near that tree that the underground electrical service from the main service disconnect ran back to the old barn and from there branching out to other locations, including the feed barn. With the lightning strike, an electrical surge from the lightning passed through that electrical service and onto the feed barn. That power surge led to the de-icer in the north waterer short[-]circuiting. The electrical surge caused the fine nichrome wire coil in the interior ring of the de-icer to break apart with the electrical surge fusing the insulating magnesium oxide around the coil and that fused material provided a connection from the energized nichrome coil wire to

---

[5] Ventricular fibrillation is when "the heart is quivering" but is not pumping blood in or out. Tr. at 150.

the steel shroud of the heater.  The shroud was connected to the ground wire within the de-icer's power cord and, *as Mr. Diehm had cross-wired the plug, the electrical current flowed back to the service panel box.  Because Mr. Pfafman had not installed a bonding jumper at the service panel box, the electrical current did not flow to the breaker.*  Consequently, the breaker did not trip to de-energize the circuit.  Instead, electrical current flowed to the panel box and ground wire and energized the metal feed barn, including the metal stanchion, which Kole Craig would eventually come to touch.  In addition, *because GFCI protection had not been installed on the deicer circuit, there was no GFCI plug or breaker in place that would have tripped with the short circuit and thereby de-energized the line.*  As a result, when Kole Craig accompanied Lynn Diehm to check on the dead steer, the feed barn and the metal stanchion were hot with electricity.

Appellees' Br. at 20-21 (emphases added).

[9]  Craig's Estate filed a complaint against Pfafman, Farm Innovators,[6] and Cooper Industries[7] alleging negligence and product liability, respectively.[8] Craig's Estate dismissed Cooper Industries prior to trial "due to a lack of evidence establishing liability."  Appellees' Br. at 7.  Craig's Estate's "claims against Farm Innovators were settled before trial."  *Id.*  And, "[p]rior to suit being filed, a settlement was reached" with Diehm.  *Id.*

---

[6]  Farm Innovators manufactured the de-icer involved in the electric shock incident.

[7]  Cooper Industries manufactured an electrical plug used to connect the de-icer.

[8]  Neither of the parties has provided this court with a copy of the complaint or any amended complaints, and neither party states the date that the original complaint was filed.  Accordingly, we glean what we can regarding the allegations in the complaint from the appellees' brief.  We note that the CCS does not indicate the date that the initial complaint was filed.

On November 2, 2015, a five-day jury trial began on Craig's Estate's claims against Pfafman. Craig's Estate argued that Pfafman was negligent in the following ways: he failed to install a "bonding jumper"[9] when he installed the service panel box in the barn, in violation of the National Electrical Code ("NEC"); he used "type NM wire"[10] without placing it inside conduit, in violation of the NEC; and he failed to install GFCI protection to the lines placed for future use in the de-icers, in violation of the NEC. Pfafman's Estate[11] argued that Pfafman did not breach his duty of care to Craig and, in the alternative, that his alleged breach of duty was not a proximate cause of Craig's injuries. In particular, Pfafman's Estate named Diehm and Farm Innovators as non-parties and argued that the jury could find that any one of the breaches of duty by Diehm and Farm Innovators proximately caused Craig's injuries, including: Diehm's decision to install de-icers in 2007 without consulting Pfafman at that time; Diehm's incorrect wiring of the de-icer that ultimately contributed to cause the short-circuit and the electric shock incident; Diehm's failure to install GFCI protection to the de-icers despite the installation instructions and Pfafman's previous instruction; Diehm's failure to unplug and store the de-icers during the summer months; and a possible defect in the de-icer

---

[9] A bonding jumper is a steel bracket that was required to be installed in the three-wire service panel box for proper grounding.

[10] According to expert testimony, using type NM wire in a barn environment without protective conduit violates the National Electrical Code.

[11] Pfafman died prior to trial, but he had given a deposition in this case prior to his death.

manufactured by Farm Innovators.  The trial court instructed the jury in relevant part as follows:

> Negligence is the failure to use reasonable care.  A person may be negligent by acting or by failing to act.  A person is negligent if he or she does something a reasonably careful person would not do in the same situation, or fails to do something a reasonably careful person would do in the same situation.  A person's conduct is legally responsible for causing an injury if:  (1) the injury would not have occurred without the conduct, and (2) the injury was a natural, probable, and foreseeable result of the conduct.  This is called a "responsible cause*."* Sometimes an unrelated event breaks the connection between a defendant's negligent action and the injury a plaintiff claims to have suffered.  If this event was not reasonably foreseeable, it is called an "intervening cause."  When an intervening cause breaks the connection between a defendant's negligent act and a plaintiff's injury, a defendant's negligent act is no longer a "responsible cause" of that plaintiff's injury.  A contractor is liable for injuries of third persons after acceptance by the property owner where the work is reasonably foreseeable to endanger third parties if an[d] only if negligently completed by the contractor.  An injury is foreseeable when a person should realize that his act or failure to act might cause that injury.  A party who violates a building, electrical or other code is not automatically liable. . . . A defendant may identify as a "nonparty" any person the defendant claims was at fault and caused any or all of the plaintiff's claimed damages.  In this case, the Estate of Gary Pfafman (Pfafman) has named Roger Diehm as a non-party.  Pfafman has the burden of proving by the greater weight of the evidence that Roger Diehm was at fault.  Pfafman has also named Farm Innovators, Inc., as a non-party. . . . To decide if Kole Craig is entitled to recover damages from the Estate of Gary Pfafman, and, if so, the amount of those damages, [you must] apportion the fault of Gary Pfafman, Roger Diehm and Farm Innovators, Inc. on a percentage basis.  Do this as follows:  First, *if Gary Pfafman is not*

*at fault, return your verdict for the Estate of Gary Pfafman and against Kole Craig, and deliberate no further. . . .*

Tr. at 1114-24 (emphasis added).

[11]  The jury entered a general verdict in favor of Pfafman's Estate. Craig's Estate then filed a motion to correct error and for a new trial alleging that the verdict was against the weight of the evidence. Following a hearing, the trial court adopted, verbatim, Craig's Estate's proposed findings of fact and conclusions of law and granted the motion to correct error and ordered a new trial.[12] The trial court found and concluded in part as follows:

> II. *Facts and Testimony Favorable to the Defense*
>
> A. In 2004, Mr. Diehm had informed Mr. Pfafman that Mr. Diehm might install deicers in the future if problems occurred with freezing water in the water troughs. Mr. Pfafman testified that he told Mr. Diehm that if Mr. Diehm did install deicers that Mr. Diehm would need to install [a] Ground-Fault Circuit Interrupter [on] for the deicers.
>
> B. Three years after building the hay barn, Mr. Diehm installed deicers in the two water troughs in the hay barn. Farm Innovators, Inc., manufactured the deicers. When installing the deicer to the north water trough, Mr. Diehm incorrectly wired the Cooper manufactured electrical connector. The energized

---

[12] While we acknowledge that the verbatim adoption of a party's findings and conclusions leaves us with a lower level of confidence that the findings reflect the independent judgment of the trial court, we do not find that the trial court's findings of fact and conclusions of law in this case are inherently suspect because they are verbatim reproductions of Craig's Estate's submission. *See Kitchell v. Franklin*, 26 N.E.3d 1050, 1058 (Ind. Ct. App. 2015), *trans. denied*.

conductor was placed on the neutral terminal and the neutral conductor was placed on the energized terminal. This violated the National Electric Code.

C. Mr. Diehm did not install a Ground-Fault Circuit Interrupter for the circuit to the deicers.

D. Mr. Diehm did not properly maintain and store the deicers, contrary to Farm Innovators' instructions, including leaving the deicers in the waterers year-round and not cleaning the deicers.

E. Farm Innovators, Inc., like Roger Diehm, was named as a non-party defendant under the Indiana Comparative Fault Act by Pfafman. Farm Innovators, Inc., is a corporation organized and existing under the laws of Indiana and has its principal place of business in Plymouth, Indiana. Pfafman asserted the Farm Innovators' deicers contained defects in manufacture, design, and warnings. Pfafman asserted the Farm Innovators' deicer involved in the incident had an internal fault which contributed to the barn becoming energized. Pfafman offered the testimony of Elizabeth Buc and James Finneran to support this defect contention.

F. The defense contended at trial that Mr. Pfafman performed his electrical installation work at the Feed Barn as a favor for his brother-in-law, Roger Diehm, and that Pfafman's work was only to supply lights at the Feed Barn.

G. Pfafman was not aware of Roger Diehm's installation of the deicers at the Feed Barn in approximate[ly] 2007.

H. Roger Diehm form[er]ly operated a residential and commercial construction business.

I. The lightning strikes at the Diehm farm were a cause of the deicer to malfunction. A lightning strike triggered the short-circuiting of the deicer in question.

III. *Facts and Testimony Supporting the Grant of a New Trial — That Gary Pfafman Was Negligent and Liable.*

A. Michael Franks. Mr. Franks has been a licensed electrician since 1972. Mr. Franks was called to the farm by Roger Diehm after Kole Craig's electrical shock. Mr. Franks discovered the absence of a bonding jumper in the panel box at the Feed Barn and he was the one who installed the copper wire to serve as a bonding jumper connecting the ground bar to the neutral bar.

1. He testified that the electrical work at the Feed Barn should have been completed by Pfafman in compliance with the NEC. He testified that a main bonding jumper is required by the National Electrical Code and that connecting the bonding jumper is the most important connection any electrician can make to the service panel.

2. Mr. Franks indicated that had the bonding jumper been in place the circuit breaker would have blown as soon as the deicer shorted. The Feed Barn structure would have deenergized immediately with the circuit being broken and Kole would not have been shocked. He indicated that without the bonding jumper the hay barn was not properly grounded. He stated that without the bonding jumper the electrical service panel was an accident waiting to happen — the building would become "hot" with any short circuit event.

3. Mr. Franks testified that had Mr. Pfafman installed a GFCI circuit breaker that too would have prevented Kole's electric shock incident. The NEC requires the installing electrician, here Mr. Pfafman, to place either a GFCI circuit breaker or GFCI plug on the circuit going out to the waterers. With the short circuit in the deicer, such GFCI protection would have immediately tripped, deenergizing the building and preventing the electric shock event to Kole.

4. He testified that even though Mr. Diehm had mis-wired the outlet plug, the presence of the bonding jumper would have prevented the incident as the short circuit would have blown the breaker. He testified that the ultimate safety guard in an electrical panel box is the bonding jumper.[13]

\* \* \*

V. *Conclusions of Law and Ruling That a New Trial Should Be Granted*

A. The verdict was against the weight of the evidence in that the evidence showed Gary Pfafman violated the NEC and was negligent in failing to install a bonding jumper in the service panel box at and for the Feed Barn.

B. The verdict was against the weight of the evidence in that the evidence showed that had Mr. Pfafman installed a bonding jumper, Kole Craig would not have been shocked as the short circuit with the deicer would have caused the circuit breaker to blow and such would have deenergized the Feed Barn structure.

C. The verdict was against the weight of the evidence in that the evidence showed Gary Pfafman violated the NEC and was negligent in failing to install GFCI protection to the circuit going out to the waterers. It was a violation of the NEC and negligent for Mr. Pfafman to leave his work at the Feed Barn with a taped end, 10 foot coiled wire left hanging from the support beam above the waterer. It was similarly a violation of the NEC for Mr. Pfafman to leave his completed installation work at the Feed

---

[13] The trial court's findings also include synopses of the testimony of several other experts and other witnesses at the trial, but the substance of each of those synopses is similar to that regarding Franks' testimony. The bottom line is that there was a great deal of expert witness testimony supporting Craig's Estate's contention that Pfafman breached his duty of care to Craig and that his breaches of duty proximately caused Craig's injuries.

Barn with no GFCI protection installed on the circuit going to the waterers, when that circuit was in an outdoor, wet environment and for a water application — a deicer for a waterer.

D. The verdict was against the weight of the evidence in that the evidence showed that had Mr. Pfafman installed GFCI protection, either a GFCI breaker or a GFCI plug, on the circuit going out to the water[er]s, Kole Craig would not have been shocked. The short circuit with the deicer would have caused such GFCI protection to trip and instantaneously deenergized the Feed Barn structure.

E. The verdict was against the weight of the evidence in that the evidence showed elements of cause and proximate cause were proven by the plaintiffs. Under Indiana law, a negligent defendant is liable for a plaintiff's injury if his or her actions were a proximate cause of that injury. Our Indiana Supreme Court has stated that a "negligent act is the proximate cause of *an injury* if *the injury* is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated." *Bader v. Johnson*, 732 N.E.2d 1212, 1218 (Ind. 2000) (emphasis added). As a result, "liability may not be imposed on an original negligent actor who sets into motion a chain of events if the ultimate injury was not reasonably foreseeable as the natural and probable consequence of the act or omission." *Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 108 (Ind. 2002). In addition, since enactment of Indiana's Comparative Fault Act, the Indiana Supreme Court has expressed that that doctrine of "superseding cause has been essentially swallowed up by the general definition of proximate cause. The court wrote:

> In capsule form, we conclude that the doctrines of causation and foreseeability impose the same limitations on liability as the "superseding cause" doctrine. Causation limits a negligent actor's liability to foreseeable consequences. A superseding cause is,

> by definition, one that is not reasonably foreseeable.
> As a result, the doctrine in today's world adds
> nothing to the requirement of foreseeability that is
> not already inherent in the requirement of causation.

*Control Techniques, Inc. v. Johnson*,762 N.E.2d 104, 108 (Ind. 2002). More specifically, as to superseding cause, the Indiana Supreme Court has indicated that the inquiry turns on whether the "injury" or "harm" could have been reasonably foreseen by the original negligent actor.

> A subsequent act is "superseding" when the harm
> resulting from the original negligent act "could not
> have reasonably been foreseen by the original
> negligent actor." *Vernon v. Kroger Co.*, 712 N.E.2d
> 976, 981 (Ind. 1999) (quoting *Hooks SuperX, Inc. v.
> McLaughlin*, 642 N.E.2d 514, 520 (Ind. 1994)).

*See Control Techniques*, 762 N.E.2d [at] 107. . . .

F. The verdict was against the weight of the evidence in that the evidence showed it was reasonably foreseeable someone would be shocked because Gary Pfafman failed to properly ground the Feed Barn. Pfafman knew and acknowledged that Diehm intended to use the taped pigtail Pfafman left to connect a deicer for use in the waterer. The reasonably foreseeable "harm resulting from the original negligent act" remained the same. That was of injury due to an electric shock because of improper grounding. *Roger Diehm's conduct and the claimed defect with the Farm Innovator's deicer were not a superseding cause(s), as defined by Indiana case law. They were acts to be considered by the jury with respect to the issue of comparative fault*.

G. The verdict was against the weight of the evidence in that the evidence showed Gary Pfafman's conduct was the essential cause for Kole Craig to have suffered the electric shock and his injuries. *It was only because Gary Pfafman failed to install a bonding jumper in*

*the panel box and failed to install GFCI protection on the circuit going to the waterer that Kole Craig was shocked.* Had Gary Pfafman done either of these things, as were required by the NEC, and regardless of the claimed negligent conduct of Diehm and Farm Innovators, Kole Craig would not have been shocked.

H. The verdict was against the weight of the evidence in that the evidence did not show it was justifiable or excusable for Mr. Pfafman not to comply with the NEC in performing his work at the Feed Barn. There was no expert testimony offered by the defense or by the plaintiff indicating that Mr. Pfafman should be excused under the circumstances from complying with the NEC. Neither was there any lay testimony offered for justification or excuse for Mr. Pfafman not to comply with the NEC.

I. The verdict was against the weight of the evidence regarding the circumstances under which Mr. Pfafman performed his work at the Feed Barn. Mr. Pfafman testified he performed his work at the Feed Barn as part of his P & S Electrical business. . . .

J. The verdict was against the weight of the evidence as to the contention that Pfafman only installed the "lighting" in the Feed Barn. Gary Pfafman testified that he installed the panel box, all the junction boxes, the GFCI plugs on the west wall of the Feed Barn and did all the connecting work of the wires to those locations. He also installed the ground rod and its connections to the panel box, and he installed the "pigtail" which he left hanging on the support beam above the waterer. . . .

K. The evidence favorable to the defense, discussed in Section II, above, is insufficient to support the jury's verdict.

L. The plaintiffs did not waive their right to a new trial by not moving for a directed verdict as to Pfafman and not objecting to Verdict Form A in light of the fact that Pfafman had raised comparative fault allegations as to Roger Diehm and Farm Innovators. Pfafman would have been unfairly prejudiced by an

instruction to the jury that the court had found Pfafman at fault as a matter of law and by a verdict form indicating that the jury had to find fault as to Pfafman in light of the directed verdict. Moreover, even if it could be said that there was a waiver by plaintiffs, the court retains the authority to grant a new trial where the evidence does not support the verdict, as is the case here.

THEREFORE, based upon the foregoing facts and authorities, the Court hereby, ORDERS, ADJUDGES AND DECREES that the Plaintiffs' Motion to Correct Error and Motion for New Trial BE GRANTED.

Appellant's App. at 30-54 (some emphases original). This appeal ensued.

# Discussion and Decision

## *Overview*

[12] "In order to prevail on a claim of negligence the plaintiff must show: (1) duty owed to plaintiff by defendant; (2) breach of duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by defendant's breach of duty." *King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 484 (Ind. 2003). Here, at trial, the parties agreed that Pfafman owed Craig a duty of care, and the only questions presented to the jury were: whether Pfafman breached his duty and, if so, whether his breach proximately caused Craig's injuries; and whether any fault should be allocated to the named nonparties. The jury entered a general verdict in favor of Pfafman's Estate, which means that the jury: found that Pfafman did not breach his duty of care; found that Pfafman's breach did not proximately cause Craig's injuries; or

allocated 100% fault to one or both of the nonparties. The crux of the issue on appeal is whether the jury's verdict is clearly erroneous as contrary to or not supported by the evidence.

[13] In granting Craig's Estate's motion for a new trial, the trial court concluded that, as a matter of law, Pfafman breached his duty of care to Craig and that that breach proximately caused Craig's injuries. Indeed, the trial court found that the *only* reason Craig was injured was because of Pfafman's breach of duty. Nevertheless, the trial court also stated that, under the Comparative Fault Act ("the Act"), the jury might allocate some fault to the nonparties,[14] Diehm and Farm Innovators. Accordingly, rather than entering a directed verdict in favor of Craig's Estate, the trial court ordered a new trial.

[14] We hold that the trial court's findings and conclusions are insufficient under Trial Rule 59(J). In particular, the trial court did not relate the evidence of the nonparties' negligence to the issue of comparative fault under the Act, but erroneously concluded that Pfafman's conduct was the sole cause of Craig's injuries. And the trial court did not address the possibility that the jury allocated 100% fault to Diehm and/or Farm Innovators despite the lack of an intervening cause. Accordingly, we reverse.

---

[14] A nonparty is "a person who caused or contributed to cause the alleged injury, death, or damage to property but who has not been joined in the action as a defendant." Ind. Code § 34-6-2-88 (2016).

### *Trial Rule 59(J)*

[15]   Our supreme court has explained our standard of review and the trial court's obligations under Trial Rule 59 as follows:

> As a general matter, a decision to grant a new trial (often called "acting as the thirteenth juror") is reviewed for an abuse of discretion, and the trial court's decision is given a strong presumption of correctness. *Weida v. Kegarise*, 849 N.E.2d 1147 (Ind. 2006); *see also Lake Mortg. Co. v. Federal Nat'l Mortg. Ass'n*, 262 Ind. 601, 321 N.E.2d 556 (1975). *The strong presumption of correctness only arises if the court's decision is supported by the special findings required by Trial Rule 59(J). . . .*
>
> Indiana Trial Rule 59(J) authorizes trial courts to grant new trials to correct an error in prior proceedings. In all cases where relief is granted, the court is required to "specify the general reasons" for granting relief. Setting aside a jury's verdict and granting a new trial is not to be done lightly, thus Rule 59(J) requires that, when granting a new trial because the verdict does not accord with the evidence, judges must
>
>> make special findings of fact upon each material issue or element of the claim or defense upon which a new trial is granted. Such finding shall indicate whether the decision is against the weight of the evidence or whether it is clearly erroneous as contrary to or not supported by the evidence; *if the decision is found to be against the weight of the evidence, the findings shall relate the supporting and opposing evidence to each issue upon which a new trial is granted*; if the decision is found to be clearly erroneous as contrary to or not supported by the evidence, the findings shall show why the judgment was not entered upon the evidence.
>
> Ind. Trial Rule 59(J).
>
> We have long held that strict compliance with the substantive and procedural requirements of Trial Rule 59(J) is of "paramount" importance. *Nissen Trampoline Co. v. Terre Haute First Nat'l Bank*, 265 Ind. 457, 464, 358 N.E.2d 974, 978 (1976). Specific findings are

necessary to temper the use of the "extraordinary and extreme" power to overturn a jury's verdict by assuring that the decision is based on a complete analysis of the law and facts. *Id.* at 464-65, 358 N.E.2d at 978. In *Weida v. Kegarise*, we explained that the most important reason for Rule 59(J)'s "arduous and time-consuming requirements," *Nissen*, 265 Ind. at 464-65, 358 N.E.2d at 978, is "to assure the public that the justice system is safe not only from capricious or malicious juries, but also from usurpation by unrestrained judges." *Weida*, 849 N.E.2d at 1153. In other words, when a "court overrides the jury in its special domain and substitutes its own verdict for theirs without a clear showing that the ends of justice required it, it is likely that they did not." *State v. White*, 474 N.E.2d 995, 1000 (Ind. 1985). When a court grants a new trial without making the specific findings, the remedy on appeal is to reinstate the jury verdict. *Weida*, 849 N.E.2d 1147.

*Walker v. Pullen*, 943 N.E.2d 349, 351-52 (Ind. 2011) (emphases added; footnote omitted).

[16] Here, although the trial court at one point concluded that the evidence was "insufficient to support the jury's verdict," it is clear from its multiple pronouncements about weighing the evidence that the court was acting as a thirteenth juror and determined the jury's decision to be against the weight of the evidence. *See Santelli v. Rahmatullah*, 993 N.E.2d 167, 175 (Ind. 2013). The trial court was thus bound under Trial Rule 59(J) to "relate the supporting and opposing evidence to each issue upon which a new trial is granted." *See id.*

[17] Pfafman's Estate contends that the trial court's findings and conclusions are insufficient under Trial Rule 59(J) because they are not based on "a complete analysis of the law and facts" and do not make "a clear showing that the ends of justice required" that the verdict be set aside. Appellant's Br. at 20. We must agree.

[18]     The trial court's findings and conclusions are insufficient for two reasons. First, the trial court did not relate the evidence of the nonparties' negligence to the issue of comparative fault under the Act, but erroneously concluded that Pfafman's conduct was the sole cause of Craig's injuries. Specifically, the trial court concluded that "Roger Diehm's conduct and the claimed defect with the Farm Innovator's deicer were not a superseding cause(s), as defined by Indiana case law. They were acts to be considered by the jury with respect to the issue of comparative fault." Appellant's App. at 52. And the trial court also concluded that "[i]t was *only* because Gary Pfafman failed to install a bonding jumper in the panel box and failed to install GFCI protection on the circuit going to the waterer that Kole Craig was shocked." *Id.* (emphasis added). These conclusions demonstrate that, not only did the trial court ignore the significant evidence of Diehm's and Farm Innovator's negligence, but it erroneously concluded that Pfafman's conduct was the only but-for cause of Craig's injuries. Thus, the trial court did not sufficiently relate the evidence of the nonparties' negligent conduct to the issue of comparative fault under the Act.

[19]     Second, the trial court did not consider the possibility that the jury allocated 100% fault to one or both of the nonparties despite the lack of an intervening cause.[15] In *Green v. Ford Motor Co.*, 942 N.E.2d 791, 794-96 (Ind. 2011), our

---

[15] In its brief on appeal, Pfafman's Estate points out that the trial court's "use of 'superseding' cause [in its order] is inconsistent with the jury instruction to which [Craig's Estate] did not object." Appellant's Br. at 26 n.3. And we note that the jury instruction on intervening cause is contrary to law. Our supreme court has

supreme court explained the jury's role in the allocation of fault under the Act as follows:

> The appropriate considerations in determining comparative fault are primarily established by statute. The statutory definition of "fault" provides:
>
> > (a) "Fault," for purposes of [the Indiana Product Liability Act], means an act or omission that is negligent, willful, wanton, reckless, or intentional toward the person or property of others. The term includes the following:
> >
> > > (1) Unreasonable failure to avoid an injury or to mitigate damages.
> > >
> > > (2) A finding under IC 34-20-2 . . . that a person is subject to liability for physical harm caused by a product, notwithstanding the lack of negligence

---

held that a subsequent act is intervening or "superseding" when the harm resulting from the original negligent act "could not have reasonably been foreseen by the original negligent actor." *Control Techniques*, 762 N.E.2d at 107. Thus, here, the question on the issue of intervening cause should have been whether the *harm* of electric shock was reasonably foreseeable to Pfafman when he failed to install either a bonding jumper or GFI protection. But the jury was instructed in relevant part as follows:

> Sometimes an unrelated *event* breaks the connection between a defendant's negligent action and the injury a plaintiff claims to have suffered. *If this event was not reasonably foreseeable*, it is called an "intervening cause." When an intervening cause breaks the connection between a defendant's negligent act and a plaintiff's injury, a defendant's negligent act is no longer a "responsible cause" of that plaintiff's injury.

Tr. at 1115 (emphases added). In other words, the jury was not asked to determine whether, in 2004, Pfafman could have reasonably foreseen the harm of electric shock, but whether he could have reasonably foreseen subsequent events such as Diehm's failure to install GFI protection, miswiring of a connector, and leaving the heaters in the water troughs during the summer months. Craig's Estate did not object to the instruction, and it maintains on appeal that the instruction was "proper." Appellee's Br. at 46 n.8. Thus, Craig's Estate has waived for appellate review any challenge to the instruction.

or willful, wanton, or reckless conduct
by the manufacturer or seller.

(b) "Fault," for purposes of [the Indiana Comparative Fault Act], includes any act or omission that is negligent, willful, wanton, reckless, or intentional toward the person or property of others. The term also includes unreasonable assumption of risk not constituting an enforceable express consent, incurred risk, and unreasonable failure to avoid an injury or to mitigate damages.

Ind. Code § 34-6-2-45. In evaluating and allocating comparative fault, a jury may also consider "*the relative degree of causation attributable among the responsible actors.*" *Paragon Family Restaurant v. Bartolini*, 799 N.E.2d 1048, 1056 (Ind. 2003). Our statutory scheme thus allows a diverse array of factors to be considered in the allocation of comparative fault. "*The process by which a jury analyzes the evidence, reconciles the views of its members, and reaches a unanimous decision is inherently subjective and is entitled to maximum deference. The Comparative Fault Act entrusts the allocation of fault to the sound judgment of the fact-finder.*" *Id.*

In both the Product Liability Act and the Comparative Fault Act, the legislature employed expansive language to describe the breadth of causative conduct that may be considered in determining and allocating fault. Both enactments require consideration of *the fault of all persons "who caused or contributed to cause" the harm*. Ind. Code §§ 34-20-8-1(a), 34-51-2-7(b)(1), 34-51-2-8(b)(1). We note that in prescribing the scope of such initial consideration, the legislature employed the phrase "caused or contributed to cause" instead of "proximately caused." The Comparative Fault Act, however, further specifies that, in comparative fault actions, the "legal requirements of causal relation apply." Ind. Code § 34-51-2-3. This requirement of proximate cause to establish liability was preserved in the

Indiana comparative fault scheme. *Control Techniques*[,] 762 N.E.2d [at] 109[.]

The legislature has thus directed that a broad range of potentially causative conduct initially may be considered by the fact-finder but that the jury may allocate comparative fault only to those actors whose fault was a proximate cause of the claimed injury. As explained in *Control Techniques*, "the jury is first required to decide whether an actor's negligence was a proximate cause of the plaintiff's injury." *Id.* "Whether or not proximate cause exists is primarily a question of foreseeability." *Id.* at 108. The fact-finder must evaluate whether the injury "is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated." *Id.* (quoting *Bader v. Johnson*, 732 N.E.2d 1212, 1218 (Ind. 2000)). Fault may not be imposed "on an original negligent actor who sets into motion a chain of events if the ultimate injury was not reasonably foreseeable as the natural and probable consequence of the act or omission." *Id.* The determination and allocation of each party's proportionate fault "is a question for the trier of fact, except where there is no dispute in the evidence and the fact finder could come to only one conclusion." *Walters v. Dean*, 497 N.E.2d 247, 254 (Ind. Ct. App. 1986) (internal citations omitted).

\* \* \*

The fact-finder may allocate as comparative fault only such fault that it finds to have been a proximate cause of the claimed injuries. *And if the fault of more than one actor is found to have been a proximate cause of the claimed injuries, the fact-finder, in its allocation of comparative fault, may consider the relative degree of proximate causation attributable to each of the responsible actors.*

(Emphases added). Put another way, "[u]nder comparative fault, the trier of fact can allocate fault to multiple contributing factors based on their relative

factual causation, relative culpability, or some combination of both." *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1244 (Ind. 2003).

[20] The Act provides that the trial court shall instruct the jury on the allocation of fault as follows:

> The jury shall determine the percentage of fault of the claimant, of the defendant, and of any person who is a nonparty. . . . In assessing percentage of fault, the jury *shall consider the fault of all persons who caused or contributed to cause the alleged injury*, . . . regardless of whether the person was or could have been named as a party. *The percentage of fault of parties to the action may total less than one hundred percent (100%) if the jury finds that fault contributing to cause the claimant's loss has also come from a nonparty or nonparties.*

I.C. § 34-51-2-7(b)(1) (2016) (emphases added).

[21] The first step in interpreting a statute is to determine whether the Legislature has spoken clearly and unambiguously on the point in question. *City of Carmel v. Steele*, 865 N.E.2d 612, 618 (Ind. 2007). While the Act provides that a jury may allocate fault only "to those actors whose fault was a proximate cause of the claimed injury," *see Green*, 942 N.E.2d at 795, the Act does not require that a jury allocate some fault to every actor who proximately caused the plaintiff's injury. Rather, the Act permits the allocation of any percentage or no percentage of fault to a party or nonparty who caused or contributed to cause the injury.

[22] Again, Indiana Code Section 34-51-2-7(b)(1) provides in relevant part that, in assessing the percentage of fault, the jury "*shall consider* the fault of all persons

who caused or contributed to cause the alleged injury[.]" (Emphasis added). As our supreme court has held, "[i]t is just as important to recognize what the statute does not say as it is to recognize what it does say." *State v. Dugan*, 793 N.E.2d 1034, 1036 (Ind. 2003). The statute does not say that the jury *shall allocate* fault to all persons who caused or contributed to cause the alleged injury. Rather, the jury shall merely consider a person's fault in making that determination. Moreover, and significantly, the statute expressly permits a jury to allocate less than 100% fault to a party. Indiana Code Section 34-51-2-7(b)(1) provides that the court "shall instruct the jury" that "[t]he percentage of fault of parties to the action may total less than one hundred percent (100%) if the jury finds that fault contributing to cause the claimant's loss has also come from a nonparty or nonparties." The legislature could have required that a minimum percentage of fault be allocated to a party under the statute, but it did not.

[23] "Fault," as defined in the Act, is not synonymous with "proximate cause." Rather, it is after a determination of proximate cause that a determination of fault is made under the Act. And the Act "entrusts the allocation of fault to the sound judgment of the fact-finder," *id.* at 795, based on "the relative degree of causation attributable among the responsible actors." *Bartolini*, 799 N.E.2d at 1056. Here, Pfafman identified two nonparties, Diehm and Farm Innovators, and the jury heard evidence that Craig would not have been injured but for

Diehm's conduct[16] (namely, failing to install GFCI protection; miswiring the connector; and leaving the deicers in the troughs all summer) and/or Farm Innovators' manufacture of a defective deicer. Accordingly, the trial court instructed the jury in relevant part as follows:

> [Pfafman] has named Roger Diehm as a non-party. . . . Pfafman has also named Farm Innovators, Inc., as a non-party. . . . To decide if Kole Craig is entitled to recover damages from the Estate of Gary Pfafman, and, if so, the amount of those damages, [you must] apportion the fault of Gary Pfafman, Roger Diehm and Farm Innovators, Inc. on a percentage basis. Do this as follows: First, *if Gary Pfafman is not at fault, return your verdict for the Estate of Gary Pfafman and against Kole Craig, and deliberate no further*. . . .

Tr. at 1123 (emphasis added). Thus, the general verdict in favor of Pfafman's Estate indicates either, first, that the jury found that Pfafman was not negligent *or* second, that, despite Pfafman's negligence, the jury allocated 100% fault to Diehm and/or Farm Innovators based upon the relative degree of causation attributable to them. The trial court's findings and conclusions do not adequately address the second possibility, and for that reason, they are insufficient under Trial Rule 59(J).

---

[16] The element of causation requires that the harm would not have occurred but for the defendant's conduct. *Topp v. Leffers*, 838 N.E.2d 1027, 1032 (Ind. Ct. App. 2005), *trans. denied*. The "but for" analysis presupposes that, absent the tortious conduct, a plaintiff would have been spared suffering the claimed harm. *Id.*

[24] In sum, despite its length,[17] the trial court's order omits any meaningful analysis of the evidence, including testimony by Craig's Estate's own expert witnesses, that Diehm and Farm Innovators proximately caused Craig's injuries. While the trial court's findings include a *list* of some of that evidence regarding the nonparties' negligence, the court did not explain in its conclusions why that evidence would not support a jury's allocation of fault to one or both of the nonparties with none to Pfafman's Estate. We hold that the trial court's findings and conclusions are not based on a complete analysis of the law and facts, *see* T.R. 59(J), and the court did not make "a clear showing that the ends of justice required" a new trial. *Walker*, 943 N.E.2d at 352. When a court grants a new trial without making sufficiently specific findings, the remedy on appeal is to reinstate the jury verdict. *Id.* at 353. Because the trial court's findings are insufficient here, we reinstate the jury's verdict.

## Conclusion

[25] The trial court's findings and conclusions in granting Craig's Estate's motion for a new trial are insufficient under Trial Rule 59(J). The trial court did not relate the evidence of the nonparties' negligence to the issue of comparative fault under the Act, but erroneously concluded that Pfafman's conduct was the sole cause of Craig's injuries. And the trial court did not address the possibility

---

[17] Craig's Estate appears to suggest that the *length* of the trial court's order, without more, shows that it satisfies Trial Rule 59(J). And Craig's Estate argues that, if we hold that the court's order is insufficient, we would place an "impossible burden" on trial courts. Appellee's Br. at 40. Craig's Estate's contention on this issue is without merit.

that the jury allocated 100% fault to Diehm and/or Farm Innovators despite the lack of an intervening cause. Given the evidence that there were several but-for causes of Craig's injuries attributable to the nonparties, the jury was entitled to allocate 100% fault to one or both of the nonparties and 0% to Pfafman. Accordingly, we reverse the trial court's order and reinstate the jury's verdict in favor of Pfafman's Estate.

[26] Reversed.

Vaidik, C.J., concurs in result with separate opinion.

Baker, J., concurs.

# IN THE
# COURT OF APPEALS OF INDIANA

The Estate of Gary Pfafman,

*Appellant-Defendant,*

v.

Lori Lancaster, Individually, and
as Guardian of the Estate of
Kole Craig,

*Appellee-Plaintiff.*

Court of Appeals Case No.
57A03-1603-CC-516

**Vaidik, Chief Judge, concurring in result.**

The trial court erred in finding as a matter of law that Pfafman proximately caused Craig's injuries. Therefore, I concur in the result and would reinstate the jury's verdict. But, I respectfully disagree with the majority that a jury is allowed to find an actor proximately caused an injury, yet decline to allocate a percentage of fault to that actor.

Proximate cause is a question of foreseeability, a question that must be answered by the fact-finder—in this case, the jury not the court. "A negligent act is said to be the proximate cause of an injury 'if the injury is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated.'" *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1054 (Ind. 2003) (quoting *Bader v. Johnson*, 732 N.E.2d 1212, 1218 (Ind.

2000)). "Proximate cause requires, at a minimum, that the harm would not have occurred but for the defendant's conduct." *Bader*, 732 N.E.2d at 1218. Even then, however, "liability may not be imposed on an original negligent actor who set into motion a chain of events if the ultimate injury was not reasonably foreseeable as the natural and probable consequences of the act or omission." *Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 108 (Ind. 2002). "A subsequent act is superseding when the harm resulting from the original negligent act could not have reasonably been foreseen by the original negligent actor." *Id.* at 107. Whether the ultimate injury is reasonably foreseeable "such that liability may be imposed on the original [actor]" is a matter for the jury to consider in allocating fault. *Id.*

[29] There was plenty of evidence for the jury to find that the acts of Diehm and Farm Innovators were superseding, cutting off Pfafman from liability. In particular: (1) Diehm did not install GFCI protection for the de-icers despite warnings from Pfafman and the instruction manual that accompanied the de-icers; (2) Diehm ignored the instruction manual and did not have an electrician install the de-icers; (3) Diehm miswired the de-icer that short circuited; (4) Diehm ignored the instruction manual and kept the de-icers plugged in during the summer months; and (5) the de-icer that short circuited had a manufacturing defect when it left Farm Innovators' facility. Based on this evidence, the jury could find that these subsequent acts were superseding—that Pfafman's actions did not proximately cause Craig's injuries. Put differently, given these circumstances, the issue of proximate cause and foreseeability of

injury was the jury's call.  On this basis alone, I would reverse the trial court and reinstate the jury's verdict.

[30]    I disagree with the majority when it says that even assuming there were no intervening causes to cut off Pfafman's liability, the jury was entitled to allocate 0% fault to Pfafman and 100% to the nonparties.  *See* slip op. at 27-28.  In other words, the majority concludes that even if the jury found that Pfafman was a proximate cause of Craig's injury, it was permitted to allocate no fault to him. The majority reaches its conclusion based on our Supreme Court's holding in *Green*.  The Court said in *Green* that "the jury **may** allocate comparative fault **only** to those actors whose fault was a proximate cause of the claimed injury." 942 N.E.2d at 795 (emphases added).  Thus, liability cannot be allocated to those who do not proximately cause an injury.  This does not mean that after the jury has determined which actors have proximately caused the injury, it can then decide which of those responsible actors it wants to allocate fault.

[31]    Instead, *Green* stands for the proposition that a percentage of fault is allocated to all actors whose conduct proximately caused the injury.[18]  When multiple actors are alleged to have proximately caused the plaintiff's injuries, the fact-finder must apply a two-step analysis to determine and allocate fault.  This process is

---

[18] I agree with the majority that in some cases determining fault under the Comparative Fault Act requires more than a proximate-cause inquiry.  In particular, fault also includes "assumption of risk" by a plaintiff, "incurred risk" by a plaintiff, and a plaintiff's "failure to avoid an injury or to mitigate damages" before the accident or initial injury.  Ind. Code § 34-6-2-45; *see Kocher v. Getz*, 824 N.E.2d 671, 674 (Ind. 2005).  Since none of these circumstances of fault occurred here and there is no issue of duty, breach of duty, or damages, fault is synonymous with proximate cause in this case.

outlined in *Green*: "And if the fault of more than one actor is found to have been a proximate cause of the claimed injuries, the fact-finder, in its allocation of comparative fault, may consider the relative degree of proximate causation attributable **to each** of the responsible actors." *Id.* at 796 (emphasis added). In other words, the jury first has to determine what actors proximately caused an injury. Then step two requires the jury to allocate fault among all at-fault actors. The total percentage of fault must equal 100%. *See Shand Mining, Inc. v. Clay Cty. Bd. of Comm'rs*, 671 N.E.2d 477, 479 (Ind. Ct. App. 1996) ("Under the CFA, a jury is charged with allocating 100 percent of the fault among all culpable parties and non-parties."), *reh'g denied*, *trans. denied*; *see also Kmart Corp. v. Englebright*, 719 N.E.2d 1249, 1260 (Ind. Ct. App. 1999) ("Under the Act, the total fault for an accident is apportioned between the plaintiff, defendant, and any other negligent person who is properly named as a nonparty."), *trans. denied*. Thus, once an actor is determined in step one to be a proximate cause of an injury, the jury must allocate a percentage of fault—even nominally so—to that actor.

[32] In reaching a contrary conclusion, the majority relies in part on the portion of Indiana Code section 34-51-2-7(b)(1) that permits a jury to allocate less than 100% to the parties if it finds that "fault contributing to cause the claimant's loss has also come from a nonparty or nonparties." *See* slip op. at 25. But I fail to see how this provision supports the majority's holding that a jury can find that a party's conduct was a proximate cause of the injury yet decline to allocate any of the fault to that party. In other words, the fact that a jury can allocate less

than 100% of the fault to an at-fault party in no way leads to the conclusion that the jury can simply choose to allocate 0% of the fault to that party. Nothing in Section 34-51-2-7(b)(1) allows a jury to free a responsible party—one who was a proximate cause of an injury—from liability for damages because of the "degree" of his causation in relation to other responsible parties.

[33] The majority's approach raises a number of difficult questions. Could a verdict ever be against the weight of the evidence where, as here, the plaintiff bears no fault but there are multiple at-fault actors? And if it could, how much relative causation of an actor is necessary to absolve another responsible actor from liability? Can an actor who is a proximate cause of an injury be relieved of a fault allocation when he is 10% at fault? 20%? 80%? What percentage of fault is forgivable among responsible actors?

[34] One of the main purposes of the Act is to hold a negligent actor accountable for his percentage of fault. "[T]he Act did not change the standard for imposing liability. . . . [L]iability is to be apportioned among persons whose fault caused or contributed to causing the loss in proportion to their percentages of 'fault' as found by the jury." *Control Techniques*, 762 N.E.2d at 109 (citing Ind. Code § 34-51-2-8; *Cahoon v. Cummings*, 734 N.E.2d 535, 541 (Ind. 2000)).

[35] Accordingly, I disagree with the majority that if Pfafman was a proximate cause of the injury to Craig, he may be relieved of liability "based upon the relative degree of causation attributable" to Diehm and Farm Innovators. However, I

do believe that the evidence supports the jury's verdict. As such, I concur in result only.